**ALLIANCE FOR COMMUNITY MEDIA; Alliance for Communications Democracy; People for the American Way, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**New York Citizens Committee for Responsible Media; Media Access New York; Brooklyn Producers' Group; David Channon; National Cable Television Association, Inc., Intervenors.**

**DENVER AREA EDUCATIONAL TELECOMMUNICATIONS CONSORTIUM, INC.; American Civil Liberties Union, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**New York Citizens Committee for Responsible Media; Media Access New York; Brooklyn Producers' Group; David Channon; National Cable Television Association, Inc., Intervenors.**

**ALLIANCE FOR COMMUNITY MEDIA; Alliance for Communications Democracy; People for the American Way, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**New York Citizens Committee for Responsible Media; Media Access New York; Brooklyn Producers' Group; David Channon; National Cable Television Association, Inc., Intervenors.**

**AMERICAN CIVIL LIBERTIES UNION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

New York Citizens Committee for Responsible Media; Media Access New York; Brooklyn Producers' Group; David Channon; National Cable Television Association, Inc., Intervenors.

Nos. 93–1169, 93–1171, 93–1270 and 93–1276.

United States Court of Appeals, District of Columbia Circuit.

Argued In Banc Oct. 19, 1994.

Decided June 6, 1995.

Denver Area Educational Telecommunications Consortium, Inc. and the American Civil Liberties Union, David A. Bono, Michael K. Isenman and David B. Goodhand, for petitioners the Alliance for Community Media, the Alliance for Communications Democracy, and People for the American Way, James N. Horwood, for petitioners the Alliance for Community Media and the Alliance for Communications Democracy, Andrew J. Schwartzman and Elliot Mincberg for petitioner People for the American Way.

Jacob M. Lewis, Atty., Dept. of Justice, argued the cause, for respondents. With him on the brief, were Frank W. Hunger, Asst. Atty. Gen., and Barbara L. Herwig, Atty., Dept. of Justice, William E. Kennard, Gen. Counsel, Christopher J. Wright, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Gregory M. Christopher, Counsel, F.C.C.

Robert T. Perry, was on the brief, for intervenors New York Citizens Committee for Responsible Media, Media Access New York, Brooklyn Producers' Group, and David Channon. Daniel L. Brenner, Neal M. Goldberg and Diane B. Burstein, were on the brief, for intervenor National Cable Television Ass'n, Inc. H. Robert Showers, was on the joint brief, for amici curiae National Law Center for Children and Families. With him on the joint brief were James P. Mueller for National Family Legal Foundation and Paul McGeady for Morality in Media, Inc.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge WALD, in which Circuit Judge TATEL joins and Circuit Judge ROGERS joins as to Parts II and III.

Opinion dissenting in part filed by Chief Judge EDWARDS.

Opinion concurring in part and dissenting in part filed by Circuit Judge ROGERS.

I. Michael Greenberger, argued the cause, for petitioners. With him on the briefs, were Charles S. Sims, Lisolette E. Mitz, Marjorie Heins and Arthur B. Spitzer, for petitioners

RANDOLPH, Circuit Judge:

This case is here on petitions for review of two orders of the Federal Communications Commission implementing section 10 of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460, 1486 (to be codified at 47 U.S.C. §§ 531, 532(h), 532(j), & 558). Petitioners are five organizations, some of whose members produce programming for cable "access" channels; an individual "access" programmer; and two other groups whose members watch cable television. The case was argued first to a panel of the court, which remanded it to the Commission on the grounds that sections 10(a) and 10(c) violated the freedom of speech clause of the First Amendment to the Constitution and that section 10(b), and the Commission's regulations thereunder, posed such serious constitutional questions that the Commission ought to reconsider the matter in light of the unconstitutionality of sections 10(a) and 10(c). *Alliance for Community Media v. FCC*, 10 F.3d 812, 823–24, 829 (D.C.Cir.1993). The full court vacated the panel's judgment. *Alliance for Community Media v. FCC*, 15 F.3d 186 (D.C.Cir.1994). On rehearing the case *in banc*, we sustain section 10 and the Commission's regulations.

I

The Commission gradually began asserting jurisdiction over a form of cable television—community antenna television systems—in the early 1960's. Through that decade and into the next, the pace of regulation intensified. By 1980, however, the trend had reversed itself. The cable industry experienced substantial federal deregulation, driven in no small measure by the Supreme Court's decision in *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). The Court there struck down, as beyond the Commission's statutory authority over broadcasting, its 1972 rules (as modified by its 1976 rules) requiring cable operators to dedicate four of their "channels for public, governmental, educational, and leased access." *Id.* at 691, 99 S.Ct. at 1437. Cable operators "own the physical cable network and transmit the cable signal

to the viewer." *Turner Broadcasting Sys., Inc. v. FCC*, —— U.S. ——, ——, 114 S.Ct. 2445, 2452, 129 L.Ed.2d 497 (1994). By "transferr[ing] control of the content of access cable channels from cable operators to members of the public," the Commission had—the Court held in *Midwest Video*—transformed cable operators into "common carriers." 440 U.S. at 700, 701, 99 S.Ct. at 1441, 1442. Congress had prohibited the Commission from imposing common-carrier obligations on broadcasters because this would intrude on their editorial control over programming. *Id.* at 705, 99 S.Ct. at 1444. Cable operators were situated similarly. They shared "with broadcasters a significant amount of editorial discretion regarding what their programming will include," and, like broadcasters, could not be burdened with common carrier obligations without Congress' express direction. *Id.* at 707, 709, 99 S.Ct. at 1445, 1446.

The Cable Communications Policy Act of 1984 revived much of the agency-created system struck down five years earlier in *Midwest Video*. The 1984 Act compelled cable operators of systems with more than thirty-six channels to set aside between 10 and 15 percent of their channels for commercial use by persons unaffiliated with the operator. 47 U.S.C. § 532(b). On these "leased access" channels, the statute forbade the operator from exercising "any editorial control over" the programming, "except that an operator may consider such content to the minimum extent necessary to establish a reasonable price" for the use of the channel. 47 U.S.C. § 532(c)(2). In return, the 1984 Act exempted operators from criminal and civil liability arising from programs carried on leased access channels. 47 U.S.C. § 558 (amended 1992). While thus removing the operators' control over and legal responsibility for leased access programming, the 1984 Act empowered local franchising authorities to bar or regulate such programming if, in the authority's judgment, it "is obscene, or is in conflict with community standards in that it is lewd, lascivious, filthy, or indecent or is otherwise unprotected by the Constitution of the United States." 47 U.S.C. § 532(h).

The 1984 Act also authorized local franchising authorities to require, as a condition for a franchise or for the renewal of one, that operators set aside "channel capacity" for "public, educational, or governmental use." 47 U.S.C. § 531. Subject to section 544(d), cable operators were forbidden from exercising any editorial control over programming shown on these "PEG access" channels. 47 U.S.C. § 531(e) (amended 1992). Section 544(d)(1) permitted cable operators and franchise authorities to specify that cable services would not be provided if they are "obscene or are otherwise unprotected by the Constitution." As with leased access, section 558 of the 1984 Act relieved cable operators from criminal and civil liability for programs carried on PEG channels.

In "order to restrict the viewing of programming which is obscene or indecent, upon the request of a subscriber," section 544(d)(2) required cable operators to provide equipment—commonly known as a "lockbox"—enabling the subscriber to block a channel during particular periods. 47 U.S.C. § 544(d).

In 1992, for reasons we describe below, *see infra* p. 117, Congress decided that revisions were needed in the 1984 Act's treatment of leased access and PEG access channels. Section 10 of the Cable Television Consumer Protection and Competition Act of 1992, which is set forth in the margin,[1] altered the existing system in several ways. Section 10(a) permitted a cable operator to refuse to carry leased access programming the operator "reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards." Pub.L. No. 102–385, § 10(a), 106 Stat. 1460, 1486 (1992) (to be codified at 47 U.S.C. § 532(h)). In order "to limit the access of children to indecent programming," section 10(b) directed the Commission to prescribe rules requiring cable operators who choose to carry indecent programming on leased access channels to place such programs on a separate channel and to block the channel until the subscriber, in writing, requests unblocking. *Id.* § 10(b) (to be codified at 47 U.S.C. § 532(j)). Section 10(c) required the Commission to promulgate regulations enabling cable operators to prohibit the use of PEG

---

**1.** Sec. 10. Children's Protection From Indecent Programming on Leased Access Channels

(a) Authority to Enforce.—Section 612(h) of the Communications Act of 1934 (47 U.S.C. 532(h)) is amended—
(1) by inserting "or the cable operator" after "franchising authority"; and
(2) by adding at the end thereof the following: "This subsection shall permit a cable operator to enforce prospectively a written and published policy of prohibiting programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards.".
(b) Commission Regulations.—Section 612 of the Communications Act of 1934 (47 U.S.C. 532) is amended by inserting after subsection (i) (as added by section 9(c) of this Act) the following new subsection:
"(j)(1) Within 120 days following the date of the enactment of this subsection, the Commission shall promulgate regulations designed to limit the access of children to indecent programming, as defined by Commission regulations, and which cable operators have not voluntarily prohibited under subsection (h) by—
"(A) requiring cable operators to place on a single channel all indecent programs, as identified by program providers, intended for carriage on channels designated for commercial use under this section;
"(B) requiring cable operators to block such single channel unless the subscriber requests access to such channel in writing; and
"(C) requiring programmers to inform cable operators if the program would be indecent as defined by Commission regulations.
"(2) Cable operators shall comply with the regulations promulgated pursuant to paragraph (1).".
(c) Prohibits System Use.—Within 180 days following the date of the enactment of this Act, the Federal Communications Commission shall promulgate such regulations as may be necessary to enable a cable operator of a cable system to prohibit the use, on such system, of any channel capacity of any public, educational, or governmental access facility for any programming which contains obscene material, sexually explicit conduct, or material soliciting or promoting unlawful conduct.
(d) Conforming Amendment.—Section 638 of the Communications Act of 1934 (47 U.S.C. 558) is amended by striking the period at the end and inserting the following: "unless the program involves obscene material.".
Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, § 10, 106 Stat. 1460, 1486 (1992) (codified at 47 U.S.C. §§ 531, 532(h), 532(j) & 558).

access channels for "any programming which contains obscene material, sexually explicit conduct, or material soliciting or promoting unlawful conduct." *Id.* § 10(c) (to be codified at 47 U.S.C. § 531). Section 10(d) eliminated cable operators' immunity from criminal and civil liability for obscene programming shown on access channels. *Id.* § 10(d) (to be codified at 47 U.S.C. § 558).

In early 1993, the Commission released two Reports and Orders adopting regulations to implement section 10. In the first, the Commission issued regulations implementing sections 10(a) and 10(b), the provisions applying to leased access channels. The Commission defined "indecent" programming in terms nearly identical to those contained in the statute: "programming that describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium." *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701(g)). Leased access programmers were required to inform the cable operator which, if any, of their programs fell into that category. *Id.* (to be codified at 47 C.F.R. § 76.701(d)). Mirroring the statute, the regulations authorized private cable operators to refuse to carry indecent programming on leased access channels; or, if they decided to

do so, to segregate that material on a blocked channel. *Id.* (to be codified at 47 C.F.R. § 76.701(a)). A cable operator must satisfy a subscriber's written request to receive a blocked channel within thirty days. *Id.* (to be codified at 47 C.F.R. § 76.701(c)).[2]

The Commission's second Report and Order contained regulations implementing section 10(c), which applies to PEG access channels. These regulations authorized cable operators to prohibit programming on PEG access channels if it "contains obscene material, indecent material . . ., or material soliciting or promoting unlawful conduct."[3] *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 19,623, 19,626 (1993) (to be codified at 47 C.F.R. § 76.702). The regulations permitted cable operators to require PEG access programmers to certify that their programming contains no material in these categories. *Id.*

## II

### A

Obscenity has no constitutional protection, and the government may ban it outright in certain media, or in all. *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992). But an "indecent" program, as the Commission and the statute define the term, is not necessarily an obscene program.[4] While the

---

2. With respect to leased access channels, the 1992 Act also directed the Commission to determine the maximum reasonable rates for leased access use, to establish reasonable terms and conditions for such use, including those for billing and collection, and to create procedures for expedited resolution of rate or carriage disputes. Pub.L. No. 102–385, § 9, 106 Stat. 1460, 1484–86 (1992) (codified at 47 U.S.C. § 532(c)(4)(A)(i)–(iii)). The 1984 Act had permitted operators to negotiate with programmers the prices and terms for leased access. DANIEL L. BRENNER, ET AL., CABLE TELEVISION AND OTHER NONBROADCAST VIDEO § 6.05, at 6–50, 6–57 (1994).

 For PEG access programming, the 1984 Act authorized local franchising authorities to determine minimum PEG requirements, including allocation of channel capacity to users, availability of equipment and facilities, charges for costs, and requirements that PEG access channels be included in the basic cable tier. Robert F. Copple, *Cable Television and the Allocation of Regu-*

*latory Power: A Study of Governmental Demarcation and Roles*, 44 FED.COMM L.J. 1, 147–48 (1991). The 1992 Act explicitly authorized franchising authorities, when awarding a franchise, to "require adequate assurance that the cable operator will provide adequate public, educational, and governmental access channel capacity, facilities, or financial support." Pub.L. No. 102–385, § 7(b), 106 Stat. 1460, 1483 (1992) (codified at 47 U.S.C. § 541(1)(4)(B)).

3. The regulations define "material soliciting or promoting unlawful conduct" as "material that is otherwise proscribed by law." *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 19,623, 19,626 (1993) (to be codified at 47 C.F.R. § 76.702).

4. An indecent program is one that "describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by con-

government may nevertheless restrict the showing of indecent programs, it may do so only in a manner consistent with the First Amendment. *See Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). If decisions of cable operators not to carry indecent programs on leased or PEG access channels, decisions sections 10(a) and 10(c) permit, were treated as decisions of the government, the Commission and the United States would be hard put to defend the constitutionality of these provisions.

■ So far as sections 10(a) and 10(c) and the corresponding regulations are concerned, the case therefore turns on the presence or absence of "state action." The First Amendment's command that "Congress shall make no law ... abridging the freedom of speech, or of the press" restricts only the government. It does not control private conduct. Before one may determine whether actions taken by cable operators with respect to indecent programming on leased and PEG access channels comport with the First Amendment, one must decide whether those actions may be attributed to the government.

Petitioners initially deny that the case presents any serious state action problem: Congress enacted section 10(a) and section 10(c), and a federal agency issued regulations putting the provisions into effect; these were official actions of the government; hence state action exists. Matters are not quite so simple, however. If the government had commanded a particular result, if it had ordered cable operators to ban all indecent programs on access channels, the operators' compliance would plainly be attributable to the government. *See Action for Children's Television v. FCC,* 932 F.2d 1504, 1508–09 (D.C.Cir.1991), *cert. denied,* 503 U.S. 913, 112 S.Ct. 1281, 117 L.Ed.2d 507 (1992). State action would exist for the same reason that

the government's compelling private entities to conduct searches renders the ensuing searches subject to the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989). But sections 10(a) and 10(c) do not command. Cable operators may carry indecent programs on their access channels, or they may not. It is true that the Supreme Court has found state action even though legislation, rather than compelling a result, left the matter to the discretion of private actors. *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), and *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), are such decisions. But neither *Larkin* nor *Loretto* resembles the case before us. State action existed in both of those cases because the government conferred on private parties power that "traditionally [had been] the *exclusive* prerogative" of the government (*San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987)), in *Larkin* the power to veto liquor licenses, in *Loretto* the power to enter and occupy private property without the owner's consent. By contrast, determining what programs shall be shown on a cable television system is not traditionally within the exclusive province of government at any level. That section 10 is a federal statute authorizing action by private cable operators is therefore not itself sufficient to trigger the First Amendment. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 165–66, 98 S.Ct. 1729, 1738, 56 L.Ed.2d 185 (1978).

■ The question remains whether section 10 and the regulations establish a "sufficiently close nexus" between the government and cable operators regarding indecent programming on access channels so that state action is present. *Jackson v. Metropolitan*

---

temporary community standards for the cable medium." *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992,* 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701(g)). As all agree, this definition of indecency does not encompass all of the elements of obscenity. A work is legally obscene, according to *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d

419 (1973), if (a) " 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, ... "; (b) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (c) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

*Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974); *Skinner,* 489 U.S. at 615, 109 S.Ct. at 1412. We agree with petitioners that the question must be answered in view of the precise nature of their objection. *Blum v. Yaretsky,* 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). But what is the nature of their objection? One frame of reference reveals "a battle for supremacy between the asserted rights of private persons." Robert J. Glennon, Jr. & John E. Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement,* 1976 Sup.Ct. Rev. 221, 230. That is, petitioners are merely complaining about section 10(a)'s and section 10(c)'s restoring to cable operators' *their* option to reject indecent programming on *their* cable systems. Cable operators "are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broadcasting Sys., Inc. v. FCC,* ——— U.S. at ———, 114 S.Ct. at 2456. When an operator decides what programming will appear on its system, the operator engages in free speech. *See City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 2037–38, 90 L.Ed.2d 480 (1986); *FCC v. Midwest Video Corp.,* 440 U.S. at 707, 99 S.Ct. at 1445. It is therefore easy to see how sections 10(a) and 10(c), by giving operators editorial control over indecent programming on their systems' access channels, promote the operators' freedom of speech.[5] Petitioners, on the other hand, do not spell out in their briefs exactly how the same provisions retard their freedom of speech. We gather from their submissions to the Commission that they have members who wish to watch programs on access channels describing or depicting "sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium"; and that the programmers who count themselves among the petitioners wish to produce this sort of material for television. These interests will be damaged, petitioners told the Commission, because sections 10(a) and

10(c) will reduce the amount of indecent programming on cable access channels. The idea appears to be that if legislation altering the existing state of affairs threatens to lessen the quantity of indecent speech, the government bears the legal responsibility for the private decisions causing that result.

The question naturally arises—less indecent programming as compared to what? The status quo ante? If the state of affairs under the 1984 Act were the baseline from which to measure, as petitioners assume without stating why, their assessment of section 10's impact might be accurate. The 1984 Act did not permit cable operators to decline indecent programming on access channels; after the 1992 amendment, they had that option. But what of the period before 1984? The Supreme Court's 1979 decision in *Midwest Video* relieved cable operators of the obligation, then imposed by regulation, to provide leased access and PEG access channels. Under those early regulations, operators were required—with respect to both types of access channels—to establish rules prohibiting the "presentation of ... obscene and indecent matter." 47 C.F.R. § 76.256(d)(1)–(2) (1976); *see Midwest Video,* 440 U.S. at 693 n. 4, 99 S.Ct. at 1438 n. 4. As compared to the situation before the 1979 *Midwest Video* decision, when indecent programming on access channels was entirely forbidden, section 10 of the 1992 Act permits more—not less—such programming. Still another comparison presents itself. Rather than focusing only on the pre–1992 and post–1992 situations with respect to access channels, one might contrast access channels with other cable channels. Cable operators have always had the discretion not to carry indecent programming on their non-access channels. Yet no one would contend that the First Amendment constrained the operator's editorial judgment in this regard. We therefore cannot agree with the premise implicit in petitioners' arguments—that the 1984 Act gave rise to the constitutionally proper quantity of indecent access programming. The First Amendment did not compel the 1984

---

**5.** We express no view on whether the provisions of the 1984 and 1992 Acts requiring cable operators to set aside leased access channels and permitting franchising authorities to force operators to set aside PEG access channels infringe upon the First Amendment rights of cable operators or programmers.

Act, and it certainly did not compel prohibiting cable operators from exercising any editorial control over access programming.

This, we believe, places in the proper perspective petitioners' charge that section 10 of the 1992 Act "establishes" a "procedural scheme of private censorship." Brief for Petitioners at 20, 27. If "censorship" is understood as editorial control, petitioners are partly correct, but their description does not translate into state action. The 1984 Act also initiated what may be described as a system of "private censorship." From 1984 until 1992, Congress gave private parties in charge of programming on leased access channels complete control, free from any operators' oversight, regarding what the cable television audience could see on these channels. During that eight-year period, programmers were the ones exercising control over the content of access programming. In petitioners' terms, they were the ones acting as "private censors." When the 1992 Act gave cable operators the option of vetoing decisions of access programmers to televise indecent programs, it simply adjusted editorial authority between two private groups.

As we see it, therefore, petitioners have merely discovered an inherent characteristic of cable systems: the more discretion a cable operator has over what will appear on its system, the less discretion resides in those who have been given access to the operator's system (and vice versa). To suppose that whenever Congress restores to cable operators editorial discretion an earlier statute had removed, the operators' exercise of this discretion becomes state action subject to the First Amendment, not only would disable the legislature from correcting what it perceives as mistakes in legislation, but also would deter it from experimenting with new methods of regulating. No analogous state action decision of the Supreme Court—including *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), from which the original panel took "specific guidance" and on which it relied almost exclusively for its state action analysis (*Alliance for Community Media,* 10 F.3d at 818–22)—has ever gone so far.

*Reitman* may have leapt to mind because it too involved legislation modifying statutory restrictions on private parties. But not much can be made of the case for our purposes, certainly not nearly as much as the original panel made of it. Petitioners seem to share our judgment. *Reitman* is cited but once in their *in banc* briefs, and then only in a footnote to support the notion that it embodies a state action standard no different than *Blum v. Yaretsky,* which we will discuss more fully in a moment. Brief for Petitioners at 32 n. 16. *Reitman* began as a suit between private parties, with the plaintiffs claiming they had been denied an apartment on the basis of their race in violation of a state housing law. In 1964, while the suit was pending, California voters approved Proposition 14, a state constitutional amendment (Art. I, § 26) prohibiting the state or any subdivision or agency thereof from denying or limiting the right of any person to sell, lease or rent his real property to any "persons as he, in his absolute discretion, chooses." 387 U.S. at 371, 87 S.Ct. at 1629. One effect of adding § 26 to the state constitution was to repeal the state law prohibiting private racial discrimination in housing. If this were all § 26 accomplished, the case might have come out differently: "simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification." *Crawford v. Board of Educ.,* 458 U.S. 527, 539, 102 S.Ct. 3211, 3218, 73 L.Ed.2d 948 (1982). But in *Reitman,* Justice White, speaking for four other Justices, demonstrated the fallacy of thinking § 26 had only the effect of repealing antidiscrimination legislation. 387 U.S. at 376, 87 S.Ct. at 1631–32. "The section struck more deeply and more widely." *Id.* at 377, 87 S.Ct. at 1632. "Private discriminations in housing ... enjoyed a far different status [after enactment of § 26] than was true before passage of [the state] statutes" outlawing private racial discrimination. *Id.* After § 26, minority groups who sought new fair housing laws in California would somehow have to get the state constitution amended before they could even attempt to convince the legislature to enact such laws, while those seeking other legislation could proceed

directly to the legislature. By placing this impediment in the way of new anti-discrimination measures, § 26 itself discriminated against minority groups, and for that reason constituted action of the state forbidden by the Fourteenth Amendment.

This has long been the accepted understanding of *Reitman*. *See, e.g.,* DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT 420 (1990); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1700 (2d ed. 1988); Charles L. Black, Jr., *The Supreme Court, 1966 Term—Foreword: "State Action," Equal Protection, and California's Proposition 14*, 81 HARV.L.REV. 69, 75, 82 (1967); Robert J. Glennon, Jr. & John E. Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement*, 1976 SUP.CT.REV. 221, 247; Kenneth L. Karst & Harold W. Horowitz, Reitman v. Mulkey: *A Telophase of Substantive Equal Protection*, 1967 SUP.CT.REV. 39, 51.[6] So understood, the decision cannot support a finding of state action here. Congress may modify section 10 of the 1992 Act anytime it chooses, just as it modified the related provisions of the 1984 Act. There are no special impediments to its doing so.

Apparently recognizing this, petitioners invoke not *Reitman*, but the statement in *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2786, that "although the factual setting of each case will be significant," the government "normally" can be held accountable for a private decision "only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." The Court followed this qualified declaration with another qualification: "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05, 102 S.Ct. at 2786.

The "coercive power" element in the *Blum* formulation has no application here for reasons already suggested. Rather than coerce cable operators, section 10 gives them a choice.[7] Section 10(b)'s segregation and blocking requirements apply to "cable operators [who] have not *voluntarily* prohibited" indecent programming on leased access channels. Pub.L. No. 102–385, § 10(b), 106 Stat. 1460, 1486 (1992) (to be codified at 47 U.S.C. § 532(j)(1)) (emphasis added). The Commission too put the matter in those terms. Its first Report and Order states that any prohibition of indecent programming on leased access channels will be "voluntary, not mandatory" and that Congress did not intend cable operators to "act as involuntary government surrogates." First Report and Order, 8 F.C.C.R. 998, 1003 ¶ 30 (1993). Section 10(c) is to the same effect. It instructs the Commission to promulgate regulations *enabling*—not requiring—cable operators to prohibit indecent programming on PEG access channels (Pub.L. No. 102–385, § 10(c), 106 Stat. 1460, 1486 (1992) (to

---

**6.** The panel opinion deemed it "not critical" that "*Reitman* involved an amendment to the state constitution that also banned future enactment of fair housing laws without an additional amendment of the state constitution." *Alliance for Community Media*, 10 F.3d at 820 n. 8. The Supreme Court in *Reitman* and in *Crawford*, and each of the authors cited in the text, thought the opposite.

**7.** Judge Wald mixes apples and bricks in her four formulations of the combined effect of § 10(a) and § 10(b). Dissent at 5. Take for example, her number 1: " 'an operator *must* ban, or in the alternative *must* block' " indecent programming on leased access channels. Operators who block are necessarily operators who have not banned indecent speech. They are carrying such programs on their systems and are leaving to their subscribers the choice of tuning in. Despite all the fancy footwork, the formulations merely report that (1) under these provisions operators now have the editorial discretion to carry or not to carry indecent programming on their leased access channels; and (2) if they opt to carry such programming, they have to comply with § 10(b). To conclude from this that the operators' decisions are state action is the same as saying that if you are deciding whether to enter a particular line of business regulated by the state, your decision whether to enter the business is "state action." You "must" comply with regulations, or you "must" stay out. Or closer to home, Judge Wald would find state action when an Indiana bar decides whether to have nude dancing—in her formulation, the bar either must ban nude dancing or it must block children and others who do not consent to watching the show. *Cf. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567, 111 S.Ct. 2456, 2461, 115 L.Ed.2d 504 (1991).

be codified at 47 U.S.C. § 531)) and the Commission's implementing regulation provides that cable operators "may" prohibit indecent programming on PEG access channels. *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 19,623, 19,626 (1993) (to be codified at 47 C.F.R. § 76.702).

As to the remaining portion of the *Blum* formula, petitioners offer three ways in which section 10 "has provided such significant encouragement" to cable operators not to carry indecent programming on their PEG and leased access channels that state action must be found. The first borrows from the original panel opinion's assertion "that the immediate objective of the 1992 Act is to suppress indecent material and limit its transmission on access channels" and that "the government wishes to suppress" such material on access channels. *Alliance for Community Media*, 10 F.3d at 820; Brief for Petitioners at 28. There is no doubt that section 10 embodies an objective, but it is one rather different than that described in the passages just quoted. The immediate aim—all that can be discerned from the language of the statute—is to give cable operators the prerogative not to carry indecent programming on their access channels. Experience under the 1984 Act moved Congress to legislate as it did.

"The problem," Senator Helms stated during the floor debate, "is that cable companies are required by law to carry, on leased access channels, any and every program that comes along," including programs that consist of a wide variety of highly indecent material. 138 CONG.REC. S646 (daily ed. Jan. 30, 1992). The Senator described leased access programming in New York City that "depicts men and women stripping completely nude"; another featuring people performing oral sex; a channel with ads promoting "incest, bestiality, [and] even rape"; and a channel in Puerto Rico carrying the Playboy Channel. *Id.* As he also pointed out, leased access channels are "not pay channels, they are often in the basic cable package." *Id.* Senator Thurmond mentioned leased access channels with "numerous sex shows and X-rated previews of hard-core homosexual films," as well as channels with ads for phone lines letting listeners eavesdrop on acts of incest. *Id.* at S648. PEG channels were also being used, for example, "to basically solicit prostitution through easily discernible shams such as escort services, fantasy parties, where live participants, through two-way conversation through the telephone … [solicit] illegal activities." *Id.* at S649 (statement of Sen. Fowler); *see also id.* at S650 (statement of Sen. Wirth) (agreeing that public access "clearly … has … been abused").

Before the Commission, many commenters recognized that indecent programs had been transmitted on cable access channels, both leased and PEG. Time Warner Entertainment informed the Commission that its New York City cable subsidiary carries a leased access program ("Midnight Blue") which "include[s] excerpts from sexually explicit video cassettes and films showing in graphic detail intercourse, masturbation and other sex acts," and which advertises "sex-oriented products and services, such as 'escort services,' 'dial-a-porn' telephone lines and Screw Magazine ('Midnight Blue's' print counterpart)." Comments of Time Warner Entertainment Co., L.P., at 3 (Dec. 7, 1992). The company reported that its leased access channel on which Midnight Blue appears is "usually fully booked with sexually explicit programming" every day "from 10:00 p.m. to 4:30 a.m.," and "the demand for additional time remains high." *Id.* The record before the Commission showed that indecent programming was also a problem on PEG channels. For example, the Commission was informed that programming transmitted over the public access channel serving the City of Tampa, Florida, included "visual depiction[s] of male and female nudity … simulated sexual activity, and/or sexually related physical contact between performers and audience members." Comments of City of Tampa, at 2 (Dec. 7, 1992). A Tampa viewer described turning on her local public access channel in prime time and seeing "[t]otally nude women … squatting and gyrating so that their genitals were in full view," and "a tape of a totally naked man dancing and screaming obscenities." Comments of Virginia B. Bogue, at 1 (Dec. 4, 1992). And one large cable operator noted that a public access channel

on one of its systems transmitted a program "in which an access user, frontally nude, urinated on a photograph of the President of the United States." Comments of Continental Cablevision, Inc., at 4 n. 3 (Dec. 7, 1992).

Congress could consider itself accountable for the appearance of these and other such programs. The 1984 Act made them possible by compelling cable operators to set aside leased access channels and, at the franchising authorities' direction, PEG access channels, and by barring the operators from exercising any editorial judgment over what would be shown there. Whatever may be said in support of indecent programming on access channels,[8] Congress surely does not have to promote it. In dealing with cable television, Congress, no less than states dealing with relations between races, cannot "be committed irrevocably to legislation that has proved unsuccessful or even harmful in practice." [9] *Crawford v. Board of Educ.*, 458 U.S. at 539, 102 S.Ct. at 3219. Section 10 of the 1992 Act extricated Congress from its promotional role, not by banning indecent programming on access channels, but by permitting cable operators to "police their own systems," which the 1984 Act had prevented them from doing. 138 CONG.REC. S650 (daily ed. Jan. 30, 1992) (statement of Sen. Wirth).

■ We have no doubt that among the Members of Congress who voted for the 1992 Act there are those who would applaud any cable operator's decision not to carry indecent programming on access channels, or for

that matter, on any channel. Even if we equated the view of some Members with the view of a majority, and even if we pretended that their preferences had somehow manifested themselves in statutory language, this still would not be sufficient to transform a particular operator's decision not to carry indecent programs on its access channels into a decision of the United States. "Mere approval of or acquiescence in the initiatives of a private party," *Blum* reminds us, cannot "justify holding the State responsible for those initiatives," 457 U.S. at 1004–05, 102 S.Ct. at 2786; *see Flagg Bros. v. Brooks*, 436 U.S. at 164, 98 S.Ct. at 1737–38.

■ Nor does state action result simply because legislation "encourages" the private initiative in the sense of making it possible.[10] *Blum* rejected a procedural due process challenge to decisions of state-subsidized private nursing homes, made without a hearing, to downgrade the level of treatment for patients on Medicaid. Federal Medicaid regulations required nursing homes to maintain different treatment levels and to transfer patients whenever necessary; when a nursing home downgraded a patient's treatment, the State reduced the patient's Medicaid payments. 457 U.S. at 994–95, 102 S.Ct. at 2780–81. In *Blum*, the "State was indirectly involved in the transfer decisions ... because a primary goal of the State in regulating nursing homes was to keep costs down by transferring patients from intensive treatment centers to less expensive facilities." *Rendell–Baker v.*

8. "[T]here is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance...." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 61, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976); *see FCC v. Pacifica Found.*, 438 U.S. 726, 743, 98 S.Ct. 3026, 3037, 57 L.Ed.2d 1073 (1978).

9. In light of *Crawford*, 458 U.S. at 538, 102 S.Ct. at 3218, a State's "mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place" does not make private individuals state actors so that their treatment of others on the basis of race is governed by the Fourteenth Amendment. By analogy, the Constitution did not require Congress to bar operators from exercising editorial control over indecent programming on access channels; and, contrary to Judge Wald (Dissent

at 132 n. 4), when Congress removed the bar in 1992 it did not transform operators into state actors.

10. For instance, it cannot be that because access channels came into existence as a result of governmental action, the private day-to-day decisions—by programmers or by cable operators—about what will be shown on those channels embody state action. The federal government may create corporations but the resulting quangos are not, for that reason alone, to be treated as governmental rather than private actors. *Lebron v. National Railroad Passenger Corp.*, —— U.S. ——, —— - ——, 115 S.Ct. 961, 974–75, 130 L.Ed.2d 902 (1995); *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 543 n. 23, 107 S.Ct. at 2984 n. 23; *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C.Cir. 1985).

*Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982). "State and federal regulations encouraged the nursing homes to transfer patients to less expensive facilities when appropriate." *Id.* The nursing homes' transfer decisions were nevertheless private decisions, dependent upon the medical judgment of physicians, and thus not governed by the Constitution. *Blum,* 457 U.S. at 1012, 102 S.Ct. at 2789–90. So too with section 10 of the 1992 Act, which facilitates cable operators' editorial control over indecent programming, but does not dictate the outcome or criteria operators may use in exercising their judgment about whether such programming appears on their access channels.[11]

The second way in which section 10 satisfies the *Blum* formulation, according to petitioners, is by creating "financial incentives" for operators not to carry indecent programming. The idea is that rather than incurring the costs associated with section 10(b)'s requirements, cable operators will opt for the less expensive alternative of simply banning indecent programming from leased access channels.[12] To support this prediction, petitioners quote a cable operator's comment to the Commission:

> Restricting indecent programming on leased access channels to a single channel and scrambling such programming to prevent reception unless the subscriber has affirmatively requested access will impose significant costs on the cable operator. If operators are not permitted to recover

these costs in full, they will be forced, as a practical matter, to adopt instead a policy prohibiting all such programming. The single channel requirement would thereby be converted into a *de facto* ban.

Comments of Continental Cablevisions, Inc., at 10 (Dec. 7, 1992). One notices immediately the significant condition in the comment— "If operators are not permitted to recover these costs in full. . . ." Nothing in section 10 specifies that the costs associated with segregation and blocking must be borne by cable operators, and the Commission has yet to consider the matter. The Commission has determined to take up this and related issues in its cable rate regulation proceeding upon the final resolution of this litigation. First Report and Order, 8 F.C.C.R. 998, 1003 ¶ 32 n. 29 (1993); *In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation,* 8 F.C.C.R. 5631, 5943 ¶ 502 n. 1293 (1993). The situation might well be different if the Commission were to adopt a policy that created a significant economic disincentive for operators to segregate and block indecent programming.

Judge Wald, in her dissent, also predicts that because section 10(b)'s segregation-and-blocking arrangement is "technically and administratively cumbersome," operators will choose to ban indecent speech. Dissent at 133. Hence, there is "state action" with respect to section 10(a) and leased access channels.[13] We do not understand the "technical-

---

11. Judge Wald would disregard *Blum* on the ground that the complaint there challenged the decisions of private actors, while the petition here challenges a federal statute and its implementing regulations. Dissent at 132–133. There is nothing to this. The private actors in *Blum* made their decisions pursuant to detailed state and federal regulations, *Blum,* 457 U.S. at 993–95, 102 S.Ct. at 2780–81, and the Court evaluated the regulations to determine whether they dictated the private decisions at issue, *id.* at 1006–10, 102 S.Ct. at 2786–89.

12. This argument could not supply state action with respect to section 10(c)'s authorization to operators to prohibit indecent programming on PEG channels. Section 10(b)'s segregation and blocking requirement applies to leased access channels only. We cannot imagine how that requirement could influence an operator's decision about allowing indecent programming on PEG channels.

13. On this unfounded prediction, on this single assertion, rests the entirety of Judge Wald's reasoning that § 10(a) constitutes state action for leased access channels. But what of PEG access channels, where operators have discretion under § 10(c) to carry indecent programming without any segregation and blocking? Judge Wald, without the support of Chief Judge Edwards, or Judge Rogers, offers a different rationale for detecting state action in § 10(c)—that the provision is a "content-based regulation of protected speech." Dissent at 143. Of course that thoroughly begs the question. The First Amendment protects speech not from private interference but only from *governmental* restraints. One cannot say of § 10(c) that operators might be restricting "protected speech" until one first makes the threshold determination that the actions of the operators are attributable to the government. Otherwise, whenever cable operators make content-based choices not to carry particular pro-

ly" part of this proposition. The comments of the National Cable Television Association, Inc., the principal trade association for the cable television industry, mentioned no technical difficulties in implementing section 10(b). And for good reason. Every cable system that has premium or pay-per-view channels already is constantly blocking and unblocking them and thus has the technical capability to perform this task. Perhaps there are smaller systems that do not have such channels. But the Commission took care of that difficulty in its First Order: it gave operators the choice of installing lockboxes (*see infra* p. 125) and retaining the key or numeric code until the customer requests unblocking. First Report and Order, 8 F.C.C.R. at 1009 n. 46.[14] As to Judge Wald's point about "administrative" burdens, this is a matter of costs, of who should bear the financial burden of implementing section 10(b). As we have already mentioned, that question will be determined in future proceedings. In deciding this facial challenge to the regulations we are unwilling to speculate about the outcome of those proceedings. Still less are we willing to assume that the burden of implementing section 10(b) represents "such significant encouragement" (*Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786) that the operators' choice must be deemed to be the choice of the government. The record, sparse as it is on this point, contains material pointing in the opposite direction.

■ Time Warner's request, which the Commission granted, to allow operators "to provide an additional blocked leased channel for indecent programming if the first channel becomes full," is at odds with petitioners' and Judge Wald's prediction that the cost of im-

plementing section 10(b) will force operators to ban indecent programming altogether. First Report and Order, 8 F.C.C.R. at 1009 ¶ 66. Even smaller cable systems were worried about their blocked leased access channels filling up, a concern that makes sense only if they anticipated carrying indecent programming. The burden was on petitioners, as the complaining parties, to show that because of section 10(b), the decisions of operators not to carry this material on leased access channels may be laid at the feet of the government. *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785–86; *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. at 547 n. 29, 107 S.Ct. at 2986 n. 29. And it is a burden they have not sustained.

■ Petitioners' third way of establishing state action relies on section 10(d) of the 1992 Act, the provision removing the civil and criminal immunity of cable operators for obscene programming carried on their access channels.[15] Section 10(d), they say, provides—in the words of *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786, "such significant encouragement" to operators to bar indecent programming on access channels that their "choice must in law be deemed to be that of the" government. *Blum* itself rejected a similar argument. Although state regulations penalized nursing homes for failing to "discharge or transfer patients whose continued stay [was] inappropriate," the regulations did not themselves dictate the decision to discharge or transfer. *Id.* at 1009, 102 S.Ct. at 2788. Therefore, "penalties imposed for violating the regulations add[ed] nothing to [the patients'] claim of state action." *Id.* at 1010, 102 S.Ct. at 2789. The same logic applies here. Because obscenity is not con-

gramming on any channel, there would be state action because the speech is "protected" and because the governing statute does not force the operators to carry it.

14. The Commission mentioned "technical" problems but these dealt with timing—that is, with how quickly operators could implement segregation and blocking. In order to avoid any such problems, the Commission allowed the operators 120 days to implement blocking mechanisms and procedures. First Report and Order, 8 F.C.C.R.

at 1009. In this litigation the sufficiency of that time period is not challenged.

15. Petitioners contend that section 10(d) is "particularly suspect" because it covers programming that merely "*involves* obscene material." Brief for Petitioners at 31 n. 15 (italics added); *see supra* note 1. As petitioners acknowledge, however, the Commission's unchallenged interpretation of the statutory phrase is that operators lose immunity only for material that "is unprotected by the first amendment." First Report and Order, 8 F.C.C.R. at 1005 ¶ 44 n. 40.

stitutionally protected, Congress may prohibit its showing on access channels. *See, e.g., Sable Communications of California, Inc. v. FCC,* 492 U.S. at 124, 109 S.Ct. at 2835–36. Nothing in section 10(a), section 10(b), or section 10(c) compels cable operators to refuse to carry indecent programming. The matter is left to their editorial discretion. With discretion comes responsibility. Section 10(d) thus imposes on cable operators the same liability for obscene access programming that operators long have had with respect to other programming on channels they control. 47 U.S.C. § 558 (amended 1992). Under the 1992 Act, whenever an operator chooses to carry indecent programming on any channel, it does so against the backdrop of Congress's prohibition against obscenity on cable television. That a cable operator takes this into account in deciding which programs to carry—on any channel—does not convert its refusal to carry indecent programming into state action. *See Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60, 109 S.Ct. 916, 925–26, 103 L.Ed.2d 34 (1989); *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291, 1297 n. 6 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988).[16]

### B

 Petitioners think that by calling leased access and PEG channels "public fo-

rums" they may avoid the state action problem and invoke the line of First Amendment decisions restricting governmental control of speakers because of the location of their speech. But a "public forum," or even a "nonpublic forum," in First Amendment parlance is government property. It is not, for instance, a bulletin board in a supermarket, devoted to the public's use, or a page in a newspaper reserved for readers to exchange messages, or a privately owned and operated computer network available to all those willing to pay the subscription fee. The Supreme Court uses the "public forum" designation, or lack thereof, to judge "restrictions that the government seeks to place on the use of *its* property." *International Soc'y for Krishna Consciousness v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (italics added). State action is present because the property is the government's and the government is doing the restricting. In this line of cases, regulation of speech on government property traditionally used for public expression—streets and parks, for instance—gets the highest level of scrutiny. *Id.; Christian Knights of the Ku Klux Klan v. District of Columbia,* 972 F.2d 365, 372 (D.C.Cir.1992). These are the typical "public forums." Regulation of government property opened for expressive activity, although not traditionally so used, gets the same First

---

**16.** Three other courts of appeals have found no state action in comparable contexts. *Dial Info. Servs. Corp. v. Thornburgh,* 938 F.2d 1535 (2d Cir.1991), *cert. denied,* 502 U.S. 1072, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992); *Information Providers' Coalition v. FCC,* 928 F.2d 866 (9th Cir. 1991); *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.,* 802 F.2d 1352 (11th Cir. 1986). Acting pursuant to a federal statute, telephone companies furnishing billing services to dial-a-porn purveyors blocked their indecent messages until customers, in writing, specifically requested access. The purveyors challenged the statute as a prior restraint in violation of the First Amendment because it required them to classify their messages based on content. The Second and Ninth Circuits found no state action. *Dial Info. Servs. Corp.,* 938 F.2d at 1539, 1543; *Information Providers' Coalition,* 928 F.2d at 871, 877. Both courts of appeals ruled that because the government did not compel telephone companies to supply billing services to dial-a-porn purveyors—which is what triggered the statute's blocking and classification requirements—the

telephone companies were not state actors and the First Amendment did not apply. *Dial Info. Servs. Corp.,* 938 F.2d at 1535; *Information Providers' Coalition,* 928 F.2d at 877. In *Carlin Communication, Inc.,* the Eleventh Circuit held there was no state action in a telephone company's decision not to offer sellers of sexually explicit messages access to its prerecorded message service, even though a state regulatory agency studied the company's proposed policy, issued an order "strongly approving" the policy, and authorized a tariff amendment incorporating it. *Carlin Communication, Inc.,* 802 F.2d at 1358, 1359.

These decisions cannot be distinguished on the ground that with respect to cable television, operators must accept non-indecent access programming. What matters—in the dial-a-porn cases and in this one—is whether the government has so injected itself into the private actor's decision triggering federal regulation that the decision may, for purposes of constitutional analysis, be treated as the government's.

Amendment treatment. *International Soc'y for Krishna Consciousness,* —— U.S. at ——, 112 S.Ct. at 2705. "Nonpublic" forums—nonpublic, that is, in the respect that the government has not opened its property to the public—are treated less stringently. *Id.* All of the Supreme Court's "public forum" cases fall into one of these three categories.[17] Access channels fall into none of them. As petitioners and everyone else knows, these channels are not government owned. The channels belong to private cable operators; are managed by them as part of their systems; and are among the products for which operators collect a fee from their subscribers.

Petitioners nevertheless insist that even private property may sometimes be considered a "public forum" for First Amendment analysis. For this proposition they rest upon the italicized portion of the following statement in *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985): "[a]lthough petitioner is correct that as an initial matter a speaker must seek access to public property or to *private property dedicated to public use* to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government property at issue." The forum in *Cornelius* was the Combined Federal Campaign, created and regulated by the government, and consisting of "an annual charitable fundraising drive conducted in the federal workplace during working hours largely through the voluntary efforts of federal employees." 473 U.S. at 790, 801, 105 S.Ct. at 3443, 3448. The forum was not, in other words, what the Court described as "private property dedicated to public use." While the Court cited no examples of such private property, it may have been referring to the government function cases of *Hudgens v. NLRB,* 424 U.S. 507, 519, 96 S.Ct. 1029, 1036, 47 L.Ed.2d 196 (1976), *overruling Amalgamated Food Employees Union v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); and *Lloyd Corp. v. Tanner,* 407 U.S. 551, 568–69, 92 S.Ct. 2219, 2228–29, 33 L.Ed.2d 131 (1972), in which a similar formulation—the "doctrine of dedication of private property to public use"—made its Supreme Court debut. What makes the *Cornelius* dictum puzzling is that neither *Hudgens* nor *Lloyd* embraced any such doctrine. Far from it. In holding that private shopping centers may not be equated with public streets and parks for First Amendment purposes, *Hudgens* and *Lloyd* found the dedication-of-private-property-to-public-use notion "attenuated," "by no means" constitutionally required, and untenable.[18] *Hudgens,* 424

---

17. *See, e.g., International Soc'y for Krishna Consciousness v. Lee,* —— U.S. at ——, 112 S.Ct. at 2703 (airports owned by Port Authority of New York and New Jersey); *United States v. Kokinda,* 497 U.S. 720, 723, 110 S.Ct. 3115, 3117–18, 111 L.Ed.2d 571 (1990) (sidewalk belonging to post office); *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 792, 105 S.Ct. 3439, 3443–44, 87 L.Ed.2d 567 (1985) (fundraising campaign for federal employees established pursuant to executive order); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (sidewalk in front of Supreme Court building); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 39, 103 S.Ct. 948, 951–52, 74 L.Ed.2d 794 (1983) (school district's internal mail system); *Greer v. Spock,* 424 U.S. 828, 830, 96 S.Ct. 1211, 1213–14, 47 L.Ed.2d 505 (1976) (United States Army post); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 299, 94 S.Ct. 2714, 2715, 41 L.Ed.2d 770 (1974) (advertising space on public rapid transit vehicles); *Adderley v. Florida,* 385 U.S. 39, 40, 87 S.Ct. 242, 243–44, 17 L.Ed.2d 149 (1966) (premises of county jail). In *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 128, 131, 101 S.Ct. 2676, 2685–86, 69

L.Ed.2d 517 (1981), which petitioners do not cite, the Court held that privately owned mailboxes are not "public forums" and sustained a federal law prohibiting anyone from placing unstamped mailable matter in them. In finding no "public forum," it is uncertain whether the Court meant that mailboxes are simply private property, as Justice Stevens thought in dissent, 453 U.S. at 152, 101 S.Ct. at 2697, or, however described, are not open to the public for the expression of ideas.

A list of Supreme Court opinions using the phrase "public forum" through the October 1983 Term is contained in Daniel A. Farber & John E. Nowak, *The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication,* 70 Va.L.Rev. 1219, 1221 n. 15 (1984).

18. *Hudgens* and *Lloyd* distinguished the company town case of *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), on the grounds that the private owner of the town assumed "all of the attributes of a state-created municipality," exercised "semi-official municipal functions as a delegate of the State," and performed "the full

U.S. at 519, 96 S.Ct. at 1036; *Lloyd Corp. v. Tanner*, 407 U.S. at 569, 92 S.Ct. at 2229; *cf. Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 80–81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980).

■■■ Given the holdings of *Hudgens* and *Lloyd*, the dictum in *Cornelius* cannot serve as a basis for resurrecting this rejected doctrine. And it cannot support a determination that cable access channels are so dedicated to the public that the First Amendment confers a right on the users to be free from any control by the owner of the cable system. In saying this, we recognize that unlike our examples of supermarket bulletin boards and private computer networks, the government—in the 1984 Act—compelled cable operators to provide leased access and, if the franchising authorities so demand, PEG access channels. This had the effect, as the Commission found in its First Report and Order in this case, 8 F.C.C.R. at 1001–02 ¶ 22, and as the Supreme Court had anticipated in *Midwest Video*, 440 U.S. at 701, 99 S.Ct. at 1441–42, of imposing "common-carrier obligations on cable operators." In the communications context, however, the fact that a regulated entity is a common carrier—that under certain circumstances it must provide communications facilities to those who desire access for their own purposes (440 U.S. at 701, 99 S.Ct. at 1441–42)—does not render the entity's facilities "public forums" in the First Amendment sense and does not transform the entity's discretionary carriage decisions into decisions of the government. *See Information Providers Coalition v. FCC,* 928 F.2d at 877; *Carlin Communications,* 827 F.2d at 1297; *see also Sable Communications of California, Inc. v. FCC,* 492 U.S. at 133, 109 S.Ct. at 2840 (Scalia, J., concurring). A heavily regulated private carrier of electricity may cut off service without having its decision scrutinized as if it were a state decision, *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 358–59, 95 S.Ct. at 457–58, and a private cable operator may refuse to carry indecent programming without having

its decision tested by First Amendment principles applicable to the government alone.

\* \* \* \* \* \*

Because we find no state action here and because that essential element cannot be supplied by treating access channels as public forums, we do not reach petitioners' First Amendment attack on sections 10(a) and 10(c).

### III

We turn now to section 10(b) of the 1992 Act. The provision applies to cable operators who decide to carry indecent programming on leased access channels. As implemented by the Commission's regulations, section 10(b) directs these operators to segregate leased access programming "identified by program providers as indecent" on a particular leased channel (or channels, if more than one is needed) "available to subscribers only with their prior written consent...." *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992,* 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701(b)). Upon receipt of a subscriber's "written request for access to the programming that includes a statement that the requesting subscriber is at least eighteen years old," the operator must make the programming available within thirty days. *Id.* Petitioners detect four constitutional infirmities in this scheme: (1) section 10(b) is not the least restrictive means of achieving the government's interest; (2) it impermissibly discriminates against indecent programming on leased access channels; (3) it constitutes an invalid prior restraint; and (4) it is unconstitutionally vague.

■■■ "All questions of government are ultimately questions of ends and means." *National Fed'n of Fed. Employees v. Greenberg,* 983 F.2d 286, 290 (D.C.Cir.1993). So here. The end of section 10(b) is not in doubt—it is to "limit the access of children to indecent programming." Pub.L. No. 102–385, § 10(b), 106 Stat. 1460, 1486 (1992) (to

---

spectrum of municipal powers," *Hudgens,* 424 U.S. at 519, 96 S.Ct. at 1036 (quoting *Lloyd,* 407 U.S. at 569, 92 S.Ct. at 2229). None of the parties to this case even cite *Marsh.* The deci-

sion has no bearing on the issue before us for quite obvious reasons. Cable operators do not exercise municipal functions, let alone the "full spectrum" of municipal powers.

be codified at 47 U.S.C. § 532(j)(1)). That the government has a "compelling interest in protecting the physical and psychological well-being of minors," which "extends to shielding minors from the influence of literature that is not obscene by adult standards," is beyond dispute. *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836. Since the First Amendment permits the government to achieve that aim so long as it uses the least restrictive means, *id.* at 126, 109 S.Ct. at 2836–37, the first question section 10(b) raises is whether its segregation and blocking requirements are such means.

In deciding this issue, it is essential to begin by comparing *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), with *Sable.* In *Pacifica,* the Commission ruled that an afternoon radio broadcast containing offensive, sexually explicit language violated a federal prohibition against indecent radio communications. *Pacifica,* 438 U.S. at 731–33, 98 S.Ct. at 3030–31. Underscoring the nature of radio broadcasting—its "uniquely pervasive presence" making protection of unwilling listeners by broadcasting prior warnings impossible, *id.* at 748, 98 S.Ct. at 3040, and its accessibility to children, *id.* at 749–50, 98 S.Ct. at 3040–41—the Court held that the Commission could prohibit a radio program containing indecent words during times when there was a reasonable risk children would be in the audience, *id.* at 732, 750, 98 S.Ct. at 3031, 3041. Eleven years later, in its next encounter with federal regulation of media indecency, the Court struck down legislation totally banning indecent interstate commercial telephone messages. *Sable,* 492 U.S. at 117, 109 S.Ct. at 2832. *Sable* distinguished *Pacifica* on the bases that children do not have the same access to commercial telephone communications as they do to radio broadcasting, and that indecent telephone communications do not present the problem of surprising unwilling listeners. *Id.* at 127–28, 109 S.Ct. at 2837–38. The *Sable* Court found that the total ban on indecent commercial telephone communications limited "the content of adult telephone conversations to

that which is suitable for children to hear." *Id.* at 131, 109 S.Ct. at 2839.[19] Given these considerations, the Court ruled there were less restrictive ways, short of a total ban, to accomplish the government's goal of protecting children from indecency. *Id.*

▮▮▮▮ From *Pacifica* and *Sable,* we distill two principles applicable to this case. First, the constitutionality of indecency regulation in a given medium turns, in part, on the medium's characteristics. Second, in fashioning such regulation, the government must strive to accommodate at least two competing interests: the interest in limiting children's exposure to indecency and the interest of adults in having access to such material. As to the first, it is apparent that leased access programming has far more in common with the radio broadcast in *Pacifica* than with the telephone communication in *Sable.* Nearly fifty-six million households, more than sixty percent of all households with televisions, subscribe to cable service. H.R. CONF.REP. No. 862, 102d Cong., 2d Sess. 56 (1992), U.S.Code Cong. & Admin.News 1992, 1133. Most cable subscribers do not or cannot use antennas to receive broadcast television services. *Id.* at 57. Hence "[c]able television has become our Nation's dominant video distribution medium." S.REP. No. 92, 102d Cong., 1st Sess. 3 (1991), U.S.Code Cong. & Admin.News 1978, 1135. The cable audience, like the radio broadcast audience, "constantly tun[es] in and out," so that prior warnings will not "completely protect the . . . viewer from unexpected program content." *Id.* Unlike services that subscribers affirmatively choose and pay for, such as dial-a-porn or cable pay-per-view and premium channels, leased access channels automatically come into all cable subscribers' homes. Indecent leased access programming thus hardly qualifies as an "invited guest," *see* Judge Wald, dissenting, at 139. A cable subscriber no more asks for such programming than did the offended listener in *Pacifica* who turned on his radio. Cable television now provides a vast amount of information in an easily accessible way. In this respect, it is similar to

**19.** That finding necessarily entails the proposition that there are conversations unsuitable for children to hear.

broadcasting. Consequently, it makes no sense to say that the First Amendment requires a household either to forego cable television altogether or risk exposure to indecency. For purposes of regulating indecency on those channels, we conclude that cable television is sufficiently pervasive and easily accessible to children to justify the government's attempts to regulate indecency on cable channels.

In light of the nature of leased access programming, does section 10(b) represent the least restrictive means of furthering the government's goal of protecting children from indecent programming? Petitioners say no, Congress could have accomplished what segregation and blocking achieve either by continuing to rely entirely on the 1984 Act's provision giving cable viewers the option of voluntarily blocking indecent programming, 47 U.S.C. § 544(d)(2)(A), or by confining indecent programming to late at night—a "safe harbor." We agree with the government that, given the pervasiveness of cable television and its accessibility to children, neither of these options would have achieved the government's aims. As to subscriber-initiated blocking, the Commission concluded that the type of programming with which section 10(b) is concerned presents special problems such a system does not solve. Leased access programming "may come from a wide variety of independent sources, with no single editor controlling [its] selection and presentation," placing a cable viewer in risk of being intermittently and randomly confronted with patently offensive displays of sexual or excretory activities or organs. First Report and Order, 8 F.C.C.R. 998, 1000 ¶ 15 (1993). To prevent exposing children to such programming under a voluntary blocking system, cable viewers would have two, equally unacceptable options. Either they could continually activate and deactivate their lockboxes, inevitably risking a slip up or a lapse that would expose their children to indecency, or they could install lockboxes permanently, thereby giving up leased access programming altogether. *Id.* at 1000–01 ¶ 15; *cf. Dial Info. Servs.,* 938 F.2d at 1542 ("voluntary blocking would not even come close to eliminating as much of the access of children to dial-a-porn as ...

would [a] presubscription requirement"). Nor would a "safe harbor" period protect children from indecent programming as effectively as section 10(b)'s segregation and blocking requirements. Even during late hours, some unsupervised children will be watching cable television and thereby have access to indecent programming, a risk that section 10(b) eliminates. Not only do section 10(b)'s segregation and blocking requirements most effectively further the compelling interest in protecting children from indecent leased access programming, but also this provision minimally burdens those adults who wish to watch such material. In this respect, section 10(b) differs markedly from the regulations considered in *Pacifica* and *Sable.* In *Pacifica,* an adult could not tune into indecent broadcasting at times when "there [was] a reasonable risk that children [might] be in the audience," 438 U.S. at 732, 98 S.Ct. at 3031; and in *Sable,* an adult could never dial into indecent commercial telephone messages, 492 U.S. at 131, 109 S.Ct. at 2839. By contrast, section 10(b) provides that those adults desiring to watch indecent programs on the channel the operator has set aside can do so no later than thirty days from the date of their request. *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992,* 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701(c)). In fact, segregation and blocking appear to accommodate the interests of those viewers who want indecent programming *better* than would a safe harbor system, under which cable viewers would be confined to watching such programming during designated, often inconvenient time periods.

Given its effectiveness in limiting the exposure of children to indecent programming and its insignificant restriction of adults' access to such material, we conclude that section 10(b) passes the least restrictive means test.

Petitioners' second argument is that the segregation-and-blocking system unconstitutionally discriminates against programming on leased access channels. Section 10(b), according to petitioners, embodies "speaker-based discrimination" in violation of

the First Amendment and the equal protection component of the Fifth Amendment because similar regulations do not apply to other types of channels. We find this idea tenuous. Section 10(b) no more singles out indecent leased access programming for regulation than did the 1984 Act, which petitioners tout as the epitome of constitutionality. *See infra* p. 114. They ignore entirely that a blocking system has been in place for all channels, and thus with respect to all "speakers" on cable television, since 1984. As we have mentioned, the 1984 Act, in "order to restrict the viewing of programming which is obscene or indecent," required cable operators to sell or lease requesting subscribers "a device by which the subscriber can prohibit viewing of a particular cable service during periods selected by that subscriber." 47 U.S.C. § 544(d)(2)(A). These devices, commonly known as lockboxes or "parental control devices," use a key or a numeric code to lock out certain channels. DANIEL L. BRENNER, ET AL., CABLE TELEVISION AND OTHER NONBROADCAST VIDEO § 6.09[3][c], at 6–98 (1994). Employing the devices, subscribers can "decide whether to block a channel and have the operator keep that channel out of their home by the flick of a switch." *Id.* Section 10(b) of the 1992 Act altered this system so that blocking on leased access channels carrying indecent programming is now operator-initiated, with subscribers retaining the option of having the channel unblocked.[20]

From the perspective of those petitioners who show or wish to show indecent programs on these channels, the difference between the two systems amounts to this: under the 1984 Act, their material got into the home unless the subscriber locked it out; under the 1992 Act, their material does not get into the home unless the subscriber invites it in. Either way the programmers' products are available to those who want to watch them. Of course, there will always be subscribers disinclined to any action regardless of what system is in place. Before 1984, their television sets would receive the indecent programs shown on these channels; after 1992, they would not. But we see no reason why leased access programmers should necessarily retain the advantage of such inertia, and we can conceive of no constitutional principle entitling them to do so. Furthermore, there is little difference between section 10's treatment of indecent leased access programming and the 1992 Act's handling of pay-per-view programming. Under current regulations, pay-per-view programs are, in effect, blocked and segregated: as the "negative option billing" provision requires, a subscriber will not receive such programs unless he or she specifically so requests. 47 U.S.C. § 543(f) ("A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name.").[21] If that is constitutional, and it surely is, so is section 10(b).

We reach the same conclusion when we consider the matter from the perspective of those petitioners who are cable subscribers. For the purpose of this analysis, subscribers may be divided into two classes—those who do, and those who do not, want to receive indecent programming on leased access channels. Before the 1992 Act, viewers in the do-not-want category always had to take the initiative and to bear the expense of blocking indecent programming from their homes. It was up to them to request their cable operators to provide lockboxes to them, and they paid for the equipment. With the 1992 Act, it is the do-want class who must take the initiative: they are now the ones who have to make a request, in writing, for

---

**20.** Section 10(b)'s regulatory scheme parallels the one Congress imposed on the dial-a-porn industry. Under 47 U.S.C. § 223(c)(1), telephone subscribers can obtain access to obscene or indecent telephone messages only by making a written request to their telephone carriers. The Second and Ninth Circuits have rejected constitutional challenges to this statute. *Dial Info. Servs. Corp. v. Thornburgh*, 938 F.2d 1535 (2d Cir.1991), *cert. denied*, 502 U.S. 1072, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992); *Information Pro-*

*viders' Coalition v. FCC*, 928 F.2d 866 (9th Cir. 1991); *see supra* note 16.

**21.** If the operator decides to offer a "premium channel" free of charge—that is a "pay service offered on a per channel or per program basis, which offers movies rated by the Motion Picture Association of America as X, NC–17, or R" the operator must give at least 30 days notice of the offering and block the channel at the subscriber's request. 47 U.S.C. § 544(d)(3).

access to indecent programming.[22] Under both systems, adults who wish to receive this type of material receive it. Certainly, as to the 1984 Act's lockbox system, there can be no constitutional objection. If individuals do not want indecent material coming into their homes, they have every right to keep it out. Nothing in the Constitution gives cable operators and programmers the right to demand that subscribers watch whatever they produce. The corollary to the freedom to bring expressive material into the home is the freedom not to bring it in. By requiring lockboxes to be made available upon request, the 1984 Congress facilitated the freedom of viewers and thereby advanced First Amendment values. It cannot make a constitutional difference that the 1992 Congress, through section 10(b), has also facilitated viewer preferences by shifting the burden of making a request from the do-not-want class to the do-want class of subscribers.[23]

To say, as petitioners do, that section 10(b) distinguishes between indecent speech and other types of speech, or that it singles out leased access channels from other cable channels, supplies only a description, not an analysis. Of course section 10(b) does what petitioners say, but it does so for a particular, and for a constitutionally permissible reason—to protect children and to enhance the ability of parents to shield their children

from the influence of "adult" programming. *See Ginsberg v. New York,* 390 U.S. 629, 639–40, 88 S.Ct. 1274, 1280–81, 20 L.Ed.2d 195 (1968). The notion that Congress could not take one step in this direction without imposing section 10(b)-like requirements on all cable channels is not only untenable (*see United States v. Edge Broadcasting Co.,* —— U.S. ——, ——, 113 S.Ct. 2696, 2707, 125 L.Ed.2d 345 (1993)), but also inconsistent with the least restrictive means test we have just discussed. That constitutional principle confines the scope of the solution to the extent of the problem. *See Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, 120–24, 112 S.Ct. 501, 511–12, 116 L.Ed.2d 476 (1991). To repeat what we wrote earlier, leased access programming comes from a wide variety of sources; no single entity controls its selection and presentation; no single editor is responsible for what is shown. What will appear on these channels, and when, is anyone's guess. Without segregation and blocking, cable viewers risk subjecting themselves and their children to sporadic encounters with patently offensive displays of sexual or excretory activities or organs. First Report and Order, 8 F.C.C.R. 998, 1000 ¶ 15 (1993). Only PEG access channels are comparable. But they did not pose dangers on the order of magnitude of those identified on leased access channels, and Congress knew that if this situation changed, local

---

**22.** Viewers preferring "unimpeded, selective access to some but not all" indecent programming, *see* Judge Wald, dissenting, at 136, still have the option of requesting access to a blocked channel and installing a lockbox that enables them to block indecent programming they do not want their children to see. Judge Wald apparently agrees that lockboxes are effective means of restricting access to indecent programming. *See id.* at 140–41.

**23.** Petitioners do not contend that any stigma attaches to a subscriber requesting unblocking or that subscribers would otherwise be deterred from making a request. Playboy's pay-per-view channel, to which subscribers must also request access, apparently has a large audience. *See* Comments of New York Citizens Committee for Responsible Media, at 11 (Dec. 29, 1992). Moreover, the 1984 Act and the 1992 Act contain provisions protecting the privacy of subscribers in their dealings with cable operators. Pub.L. No. 102–385, § 20, 106 Stat. 1460, 1497–98 (1992) (codified at 47 U.S.C. §§ 551(a)(2), 551(c)(2)); Pub.L. No. 98–549, § 631, 98 Stat.

2779, 2794–95 (1984) (codified at 47 U.S.C. § 551). Although the parties do not mention the case, it is worth noting that for these reasons *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), is distinguishable. The Supreme Court there struck down a statute directing the Post Office to detain mail containing "communist political propaganda" and to deliver it only upon the addressee's affirmative request. *Id.* at 302, 307, 85 S.Ct. at 1494, 1496. The law set federal officials "astride the flow of mail to inspect it, appraise it, write the addressee about it, and await a response before dispatching the mail," *id.* at 306, 85 S.Ct. at 1496, and the Court rested its decision on the "narrow ground" that this would deter persons from requesting such mail because they "might think they would invite disaster if they read what the Federal Government says contains the seeds of treason," *id.* at 307, 85 S.Ct. at 1496. It is not the federal government, but private cable operators, who receive the unblocking requests, and federal law forbids the operators from revealing what choice any particular subscriber has made.

franchising authorities could respond by issuing "rules and procedures" or other "requirements" pursuant to the 1984 Act, 47 U.S.C. § 531(a) & (b), or by eliminating PEG access channels altogether, 47 U.S.C. § 531(a). If Congress nevertheless had stretched section 10(b) to cover other cable channels, if it had not concentrated only on leased access channels, it could have been charged with having regulated more extensively than necessary. While there undoubtedly is indecent programming on other cable channels,[24] the Commission found that cable operators generally provide it through "per-program or per channel services that subscribers must specifically request in advance, in the same manner as under the blocking approach mandated by section 10(b)." First Report and Order, 8 F.C.C.R. at 1001 ¶ 19 n. 20. Indeed, petitioners' examples of indecency on other nonleased access channels—the Playboy Channel and "Real Sex" on HBO—fall into this category. In short, there is no constitutional rule forbidding Congress from addressing only the most severe aspects of this problem, and there are constitutional doctrines, such as narrow tailoring and least restrictive means, that may have constrained it from going further than necessary.

 Petitioners' two remaining contentions regarding section 10(b) merit only

brief discussion. That the Commission's regulations give a cable operator up to thirty days to comply with a subscriber's request to unblock a leased access channel does not entail a "prior restraint" in violation of the First Amendment.[25] *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701(c)). A prior restraint is an administrative or judicial order restraining future speech. *See, e.g., Alexander v. United States*, —— U.S. ——, ——, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993); *American Library Ass'n v. Barr*, 956 F.2d 1178, 1190 (D.C.Cir.1992). Yet nothing in section 10(b) forbids speakers from speaking. *Compare Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 100 S.Ct. 1156, 1158–59, 63 L.Ed.2d 413 (1980); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975). The offerings of leased access programmers will air. Subscribers wishing to see indecent speech may not have their wishes fulfilled instantaneously,[26] just as new subscribers to cable television may have to wait for their services to be hooked up. The latter is not a prior restraint, and neither is the former. *See Dial Info. Servs. Corp.*, 938 F.2d at 1543; *Information Providers' Coalition*, 928 F.2d at 878.

24. Operators have the power to impose a segregation and blocking system on the vast majority of their non-access channels, because their editorial control over such channels is unfettered by federal regulation. The only exception is for those channels they must set aside for local broadcasting to fulfill their "must-carry obligations." *See generally* 47 U.S.C. §§ 534, 535; *Turner Broadcasting Sys., Inc. v. FCC*, —— U.S. ——, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Broadcasting, however, is regulated under a separate statutory scheme limiting indecent programming to the late evening hours. *See generally Action for Children's Television v. FCC*, 11 F.3d 170 (D.C.Cir.1993), *reh'g in banc granted*, 15 F.3d 186 (D.C.Cir.1994). As to PEG access channels, section 10(c) of the 1992 Act gives cable operators "broad discretion" to decide how to treat indecent programming carried there, and may if they choose impose a blocking system. Second Report and Order, 8 F.C.C.R. 2638, 2641 ¶ 19. According to the Commission, Brief for the Commission at 45, operators are not prohibited from imposing a segregation and blocking system for PEG channels. *See* First Report and Order, 8 F.C.C.R. at 1005 ¶ 43 n. 39. Thus,

under section 10(b) operators are *required* to segregate and block indecent programming carried on leased access channels, while they are generally *permitted* to do so on other channels.

25. Petitioners also contend that § 10 as a whole constitutes a prior restraint because cable operators are "pressured to censor" indecent programming according to a regulatory scheme that "dictates the contours of this censorship." Although framed in different terms, this argument is essentially identical to petitioners' claim regarding state action, which we discussed and rejected. *See supra* pp. 112–121. We reiterate that cable operators who decide to prohibit indecent programming on access channels are not state actors. Consequently, their banning of such material cannot constitute a prior restraint. *Cf. Dial Info. Servs.*, 938 F.2d at 1543; *Information Providers' Coalition*, 928 F.2d at 877.

26. The FCC determined that a written request, rather than a telephonic one, was necessary to enable a cable operator to ascertain that the requestor is over eighteen years old. First Report and Order, 8 F.C.C.R. at 1009 ¶ 67.

The government is neither prohibiting indecent programming in advance, nor requiring anyone to obtain the government's stamp of approval before a program airs.

■■■ Petitioners' remaining argument is that section 10(b) is impermissibly vague because leased access programmers must identify for cable operators which of their programs are indecent. Programmers thus must "worry about what a cable operator may 'reasonably believe' to be indecent." Brief for Petitioners at 46. The Commission's definition of indecent programming essentially tracks the definition of broadcast indecency this court reviewed in *Action for Children's Television v. FCC*, 932 F.2d 1504, 1507–08 (D.C.Cir.1991), *cert. denied*, 503 U.S. 914, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992) (*ACT II*). *Compare Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701(g)). In *ACT II*, 932 F.2d at 1507–08, and in *Action for Children's Television v. FCC*, 852 F.2d 1332, 1338–39 (D.C.Cir.1988) (*ACT I*), we held that the Supreme Court's *Pacifica* decision foreclosed the question whether this definition of indecency was unconstitutionally vague: "if acceptance of the FCC's generic definition of 'indecent' as capable of surviving a vagueness challenge is not implicit in *Pacifica*, we have misunderstood Higher Authority and welcome correction." *ACT I*, 852 F.2d at 1339. No intervening Supreme Court decision affects our determination. There is nothing to petitioners' lament that access programmers will have trouble discerning what cable operators consider indecent. Since the Commission will resolve any conflicts between a programmer and an operator on this issue, First Report and Order, 8 F.C.C.R. at 1010 ¶ 75,

programmers must ultimately concern themselves with potential *Commission* determinations regarding indecency. In this respect, they are in precisely the same situation as the petitioners in *ACT I* and *ACT II*.

\* \* \*

Section 10(b)'s segregation and blocking requirements satisfy the least restrictive means test; do not impermissibly single out leased access programming for regulation; do not constitute a prior restraint on speech; and are not, because of the definition of indecency, unconstitutionally vague.

*The petitions for review are denied.*

WALD, Circuit Judge, with whom TATEL, Circuit Judge, and, with respect to Parts II and III, ROGERS, Circuit Judge, join, dissenting:

Lurid descriptions of programming that may well cross over the line into obscenity and merit no First Amendment protection at all should not obscure what this case really is about. *See* Majority opinion ("Maj. op.") at 117–118. This case is *not* about obscenity; it concerns significant restrictions on a class of speech that is unquestionably entitled to constitutional protection, although possibly offensive to some audiences. *See Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). Under the broad definition of "indecency" used in this regulation, affected speech could include programs on the AIDS epidemic, abortion, childbirth, or practically any aspect of human sexuality.[1]

The Denver Area Educational Television Consortium's critically-acclaimed program The 90's Channel, transmitted on the leased

---

1. The regulations define "indecent" programming as programming "that describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium." *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 7990, 7993 (1993). The definition thus extends to any programming that includes "patently offensive" verbal descriptions or visual depictions of sexual or excretory activities, regardless of the literary, artistic, political, or scientific merit of the work as a whole. The

regulations require leased access programmers to self-certify whether their work is "indecent" under this definition, at the risk of being barred from televising future work if they err in that judgment. *First Report and Order, 8 F.C.C.R.* 998, 1005 ¶ 43, 1007 ¶ 51, 1010 ¶ 75 (1993). That the regulations will likely result in overdeterrence by risk-averse programmers seeking to avoid the professional "death penalty" imposed for certification errors seems quite apparent. The result will inevitably be an extremely broad class of programming silenced by the regulations.

access channels of eight cable systems, serving 500,000 customers, provides information and opinion on a broad range of subjects in a self-described "unvarnished" cinema-verite style. The 90's Channel has on occasion included segments on how to do a self-help gynecological exam, a documentary on the controversial Robert Mapplethorpe art exhibit, and a traditional fertility festival in Japan featuring a procession of marchers carrying images of human genitalia. Each of these programs included descriptions or depictions of sexual activities or organs that might well be considered "patently offensive" as measured by contemporary community standards. Self-applying the FCC's definition of "indecency," then, it is not at all improbable that a cable operator might declare all these programs "indecent," and find itself required under the regulations either to ban or to block them.

"Indecency" is not confined merely to material that borders on obscenity—"obscenity lite." Unlike obscenity, indecent material includes literarily, artistically, scientifically, and politically meritorious material. Indeed, by definition, it includes all "patently offensive" material that has any of these kinds of merit, and cannot be branded as obscene under the standard established by the Supreme Court in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973). In many instances, the programming's very merit will be inseparable from its seminal "offensiveness." A bowdlerized documentary on the Mapplethorpe exhibit which did not include some description or depiction of Mapplethorpe's sexually explicit photographs themselves, for example, would hardly be an informative statement on the artistic and political debate the exhibit engendered. Yet the very act of including such powerful visual or audio images, which to many viewers are "patently offensive," would court an "indecency" citation by the FCC if the cable operator did not pull the plug or consign the program to a blocked channel. It is these kinds of portentous decisions about art, politics, science and "indecency" which are implicated in this case.

While we accept that the government may have a compelling interest in protecting children from indecent programming, we agree with Judge Edwards that that interest must be pursued in the context of helping parents to make viewing choices for their children as to the programming they watch inside the home.[2] Additionally we note that producers of such programming also have a constitutional right against unnecessary governmentally-induced restrictions on their right to disseminate programs to willing adults. The legal issue devolves into one of whether the FCC's "indecency" regulations unduly burden the First Amendment rights of speakers and adult listeners on access channels of privately-owned cable systems. Before turning to this complicated question, however, we must satisfy ourselves that state action is present in Congress' statutory scheme.

## I. STATE ACTION IS INVOLVED IN SECTIONS 10(A) AND (B)

The First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech. . . ." Our state action analysis begins with the law that Congress has made in this case. Sections 10(a) and (b) of the 1992 Cable Act impose a disjunctive scheme regulating indecent speech. In tandem, they require that cable operators either ban or block "indecent" speech on leased access cable channels. The majority insists, however, that § 10(a) is exempt from constitutional scrutiny because it involves no state-imposed burden on speech. Instead, they say, § 10(a) merely restores to cable operators the "editorial control" taken away from them in the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Act"), which mandated the creation of publicly accessible leased channels and for-

---

2. We note that the Supreme Court has never actually passed on the FCC's broad definition of "indecency." *See Action for Children's Television v. FCC*, 852 F.2d 1332, 1338–39 (D.C.Cir.1988) (acknowledging that in *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Supreme Court never specifical- ly addressed whether the FCC's generic definition of indecency was unconstitutionally vague, but arguing that because the Court "implicitly" approved the definition by relying on it, lower courts are barred from addressing the vagueness issue on the merits).

bade operators from controlling the content of programs on those channels. Maj. op. at 15. In fact, § 10(a) does not restore any genuine editorial control to cable operators over indecent material. Instead § 10 insists that a cable operator either ban a governmentally-defined category of "indecent" speech outright or, if it declines, relegate it to a separate channel and block *all* households from receiving that channel unless they specifically request it in writing up to 30 days in advance. Sections 10(a) and (b) are codependent parts of one statutory scheme regulating speech. They present cable operators with an "either-or" command: accentuate the positive by banning indecent leased access programming under § 10(a), or eliminate the negative by blocking it under § 10(b). There is no "Mr. In-between." The operator can no longer in close cases let the program air on a regular leased access channel, or televise it at a later hour when fewer children are watching, as he might on a regular commercial channel. Clearly, §§ 10(a) and (b) are inseparable parts of an integrated statutory regime that aims out front to curtail cable transmission of indecent speech, and affords cable operators only the most limited choice as to how to achieve that end.

The purpose and effect of §§ 10(a) and (b) are clear enough. As their chief congressional sponsor explained, they *"forbid* cable companies from inflicting their unsuspecting subscribers with sexually explicit programs on leased access channels." 138 CONG.REC. S646 (daily ed., Jan. 30, 1992) (statement of Sen. Helms) (emphasis added). That forthright statement would ordinarily end the state action inquiry. When Congress passes a statute whose avowed purpose, and effect, is to *forbid* or severely restrict communication of a certain category of speech defined by content, state action is usually conceded. *Cf., e.g., Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 548, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983) (con-

gressional enactment may have differential effect on some categories of speech, so long as the statute is not "intended to suppress" a content-defined category of speech).

The majority argues, however, that because § 10(a) is couched in permissive language, not explicitly *requiring* the operator to ban indecent speech, there is no state action. Maj. op. at 113. But in effect, § 10 says "an operator *may* ban, or in the alternative *must* block." To illustrate the effect of the "may" language of § 10(a) when used in the context of § 10(b), we point out that the operator's options—and the burden on speech—would be no different if the regulation were expressed in any of the following terms:

1. "an operator *must* ban, or in the alternative *must* block";

2. "an operator *may* block, or in the alternative *must* ban"; or

3. "an operator *may* ban, or in the alternative *may* block, but these alternatives are to the exclusion of all others."

All these formulations, linguistically distinct, are logically and functionally equivalent. Each *commands* that the cable operator *either* ban *or* block indecent speech. Yet the §§ 10(a) and (b) option is no different in its effect. Only empty formalism would elevate Congress' choice of the nominally permissive "may" language of § 10(a) to demonstrate the absence of state action, when § 10(b) lurks in the shadows, ready to pounce.[3]

Senator Helms's statements in floor debate that § 10 merely restores editorial control to cable operators do not do much to bolster the government's anti-state action argument. *See* 138 CONG.REC. S646 (daily ed., Jan. 30, 1992) (statement of Sen. Helms) ("this is not governmental action" but "action taken by a private party"); *id.* at S649 (statement of Sen. Helms) (in colloquy, responding affirmatively to the statement, "So this is not Government censorship"). In light of Sen.

---

**3.** Although the majority does not say so expressly, its analysis of § 10(b) as the "least restrictive means" for protecting children presumes that state action is implicated. Yet, if § 10(a) does not implicate state action, it is difficult to see why § 10(b) does either, since the cable operator is no more *required* to segregate-and-block indecent programming under § 10(b) than it is to ban indecent programming under § 10(a). In either case, the operator can avoid one provision entirely by "voluntarily" electing to submit to the *other* provision.

Helms's earlier statement that the purpose of § 10 was to "forbid" cable operators from transmitting indecent programming, these later statements suggest only a belated awareness of the section's constitutional infirmities, and an attempt to put a gloss on the directive. But an unconstitutional sow's ear cannot be so easily converted into a constitutional silk purse.

The majority concedes that if the cable operator's decision to ban indecent programming under § 10(a) is state action, the regulation is a form of state censorship and cannot survive First Amendment scrutiny. Maj. op. at 113. But they go on to cite *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), for the proposition that the cable operator's decision to ban indecent programming under § 10(a), however constrained, is *not* state action, but rather the action of a private party without a sufficiently close "nexus" to the government so that the state may be held responsible for his actions. Under *Blum,* the state can be held responsible for a private decision only if the state exercises coercive power on the private actor, provides "significant encouragement" for the decision, or transfers into private hands powers traditionally exercised by the state. *Id.* at 1004–05, 102 S.Ct. at 2785–86. Here, the majority contends, none of those criteria is met.

I do not think this case fits the *Blum* model. As *Blum* itself instructs, "[f]aithful adherence to the 'state action' requirement ... requires careful attention to the grava-

men of the plaintiff's complaint." *Id.* at 1003, 102 S.Ct. at 2785. In *Blum,* nursing home patients challenged decisions by private physicians and nursing home administrators—based on "medical judgments ... according to professional standards that are not established by the State," *id.* at 1008, 102 S.Ct. at 2788—to discharge or transfer them without procedural safeguards. The *Blum* complainants sought to hold those private decisionmakers to due process standards applicable to state actors; they did "not challeng[e] particular state regulations or procedures...." on due process grounds. *Id.* at 1003, 102 S.Ct. at 2785. Here, in contrast, petitioners do not seek to apply First Amendment standards to the "actions taken by cable operators with respect to indecent programming," Maj. op. at 113. Instead, they mount a direct facial challenge to a federal statute and implementing regulations which have the avowed purpose and effect of restricting communication of a content-defined class of constitutionally-protected speech. The majority's *Blum* analysis thus asks, and answers, the wrong question. The core question here is not whether the cable operators' private decisions implicate state action; whatever the answer to that question, we have state action in the government's own ban-or-block scheme, which is what is at issue here.[4]

As the Supreme Court explained in *Lugar v. Edmondson Oil Co., Inc.*—decided the same day as *Blum*—the point of the state action inquiry is to determine whether "the

---

4. The confusion may stem from the way the argument was posed and addressed in the original panel opinion. There, the government conceded that if cable operators' decisions to ban indecent programming under §§ 10(a) and 10(c) *were* state action, the statute would impose a constitutionally impermissible censorship regime. *Alliance for Community Media v. FCC,* 10 F.3d 812, 820 n. 9 (D.C.Cir.1993), *vacated,* 15 F.3d 186 (1994). The panel held that cable operators' decisions were indeed state action. *Id.* at 818–22. The majority rejects that conclusion. But the majority's next move is a *nonsequitur:* it simply does not follow that, if the cable operators' decisions are *not* state action, then the statute itself is not state action, and is exempt from constitutional scrutiny. Indeed, it strikes me as a wholly untenable proposition that a statute duly enacted by the Congress of the United States could be anything other than state action.

The majority might better have argued that although the statute itself is plainly state action, it effects no abridgement of freedom of speech because it does nothing more than restore editorial control to cable operators. In that regard, they might have a stronger argument if the statute withdrew governmental restrictions on cable operators' control over leased and PEG access channels evenhandedly and across the board, without itself imposing differential regulations discriminating (as this statute does) on the basis of content in order to suppress a particular content-defined category of speech. *See infra,* Part IV.A. But instead of pursuing that line of reasoning, the majority would immunize the *statute itself* from constitutional scrutiny on grounds that cable operators' decisions under §§ 10(a) and 10(c) are not state action.

conduct allegedly causing the deprivation of a federal right ... [is] fairly attributable to the state." 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). To answer that question, we ask first whether the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible"; and second, whether the "party charged with the deprivation ... [is] a person who may fairly be said to be a state actor." *Id.* Here, the deprivation of First Amendment rights is "caused by ... a rule of conduct imposed by the State"—the rule requiring cable operators to ban or block a category of programming.[5] And the parties "charged with the deprivation," Congress and the FCC, are clearly "state actors."

Even if *Blum* did provide a legal analogy, which it does not, the factual record places it a galaxy apart. There is pressure in this scheme to push cable operators to ban indecent programming outright. Statements in the agency record by cable operators say that they view the § 10(b) segregation-and-blocking arrangement to be so technically and administratively cumbersome as to render it highly unattractive and indeed for many "unworkable." Joint Appendix ("J.A.") 195–97, 200, 253. *See also First Report and Order,* 8 F.C.C.R. at 1009, ¶ 69 (acknowledging technical and administrative burdens of blocking scheme).[6]

In addition, as the majority itself concedes, Maj. op. at 119–120, the Commission has yet to decide who will absorb the potentially high cost of the § 10(b) segregation-and-blocking scheme. If the cost falls on cable operators, as it presumptively must at least temporarily until the Commission authorizes a shift to subscribers or lessees, operators have a strong financial incentive, as well, to ban rather than block. *See* J.A. 200–01 (comments of Community Antenna Television Association, Inc.). Somewhat puzzlingly, the majority argues that because the Commission has not yet decided whether to allow cable operators to shift these costs, we do not know if operators will have a financial incentive to ban rather than block, and therefore petitioners have not met their burden of showing state action. Maj. op. at 119–120. That seems to me a notion at odds with our traditional constitutional test for state action. Surely the agency's delay in stating who will ultimately bear the financial burden of its scheme cannot postpone constitutional review indefinitely, once the scheme is in operation. And clearly the *present* regulations do not authorize operators to shift the costs of segregation-and-blocking to subscribers or lessees. *See Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* 8 F.C.C.R. 5631 ¶¶ 506, 516–20 (1993) (Commission sets maximum rates operators may charge lessees, based on annual calcula-

---

5. As Justice White explained in his concurrence in *Blum,* the private parties' decisions there were not based on any rule imposed by the state. 457 U.S. at 843 (White, J., concurring).

6. The Commission noted that "the new blocking requirements may be difficult for some cable systems that are not as technologically advanced as addressable systems" and "may require considerable adjustments ... in terms of rearranging existing services...." *First Report and Order,* 8 F.C.C.R. at 1009 ¶ 69. *See also* J.A. 253 (comments of Time Warner Entertainment Company, noting "technological problems" faced by nonaddressable systems). "In addition, the new regulations will require cable operators to establish new procedures for subscriber notification ... and for the processing of requests of leased access users and of subscriber requests for this channel, etc." 8 F.C.C.R. at 1009 ¶ 69. Finally, the Commission noted the special difficulties faced by "systems that require trapping devices to circumscribe access to these services." *Id.*

Some "trapping" technology would require the operator to send out employees to place signal-interdicting "traps" at each subscribing household, and to remove them when the subscriber requested the blocked service. *See* J.A. 244 (comments of National Cable Television Association, Inc.). Nor are the incentives created by these complexities simply a matter of whether the costs are recoverable. Even if cable operators were allowed to recover their costs under the § 10(b) blocking scheme, cancelling out its cost disadvantages, opting for the § 10(b) blocking scheme would still require the cable operator in many cases to hire, train and supervise additional personnel, invest in new equipment, and develop and implement additional recordkeeping procedures. *See* J.A. 200. Sound management principles suggest that if either alternative would produce the same net revenue, the less technically and administratively complex option would be preferred.

tion of "implicit fee" paid by nonaffiliated commercial programmers, with no provision for cost-based adjustments). Until the Commission takes affirmative measures to allow cost-shifting, any operator undertaking segregation-and-blocking under § 10(b) bears the expense without any promise of recoupment. He therefore has a financial incentive to ban rather than block.

On the basis of the combined technical, administrative, and financial burdens imposed on cable operators under § 10(b), I have no difficulty even under a *Blum*-type rationale in concluding that the § 10 regulatory scheme "significantly encourages" them to ban indecent speech, thereby converting the cable operator's decision to ban under § 10(a) into state action.[7]

In sum, §§ 10(a) and (b) in tandem constitute state action.[8]

## II. Sections 10(A) and (B) Cause a Deprivation of First Amendment Speech Rights

The majority relies on the untenable notion that requiring adults to separately request "indecent" leased access programming

in writing, wait up to 30 days to receive such service, and possibly be required to pay extra for it, poses no burden whatsoever on the speech rights of either the speakers or receivers of such speech. *See* Maj. op. at 127. This does not square with reality. If the government imposed similar restrictions on other categories of speech, such as speech concerning nuclear power or criticism of government officials, and required that citizens could receive it only after separately requesting it in writing and then waiting up to 30 days to receive it, we would almost surely say that the speech rights of both speakers and listeners were unduly burdened. In *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the Supreme Court struck down a statute providing that the Post Office deliver "communist propaganda" only upon written request in advance from the recipient. The Court ruled "on the narrow ground that the addressee in order to receive his mail must request in writing that it be delivered," *id.* at 307, 85 S.Ct. at 1496, and thus the recipient "carries an affirmative obligation which we do not think the Government may impose on him."

7. For the reasons detailed in Part IV.B. *infra*, I believe § 10(a) would be constitutionally impermissible even if it stood alone—which, of course, it does not. Given the structure of the statutory provisions affecting leased access programming, and their avowed purpose to *"forbid* cable companies from inflicting their unsuspecting subscribers with sexually explicit programs on leased access channels," 138 Cong.Rec. S646 (daily ed., Jan. 30, 1992) (statement of Sen. Helms), I do not think § 10(a) is severable from § 10(b). The "relevant inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (emphasis in original). If we were to strike down § 10(b) and leave § 10(a), cable operators would be left with discretion whether to "inflict[ ] their unsuspecting subscribers with sexually explicit programs," flatly contradicting the stated purpose of the provisions.

8. The majority also rejects petitioners' alternative argument, that because leased and public access channels are a "public forum" for purposes of First Amendment analysis, the government may not authorize private parties to censor speech there.

It is a close question. While the legislative history of the 1984 Cable Act uses the term

"public forum" in describing leased and public access channels, admittedly there is no clear indication that Congress was using that term in its technical First Amendment sense, classifying cable access channels with such traditional public fora as parks and streets. However, I disagree with the majority's suggestion that a public forum can *never* exist on private property. *See* Maj. op. at 121–123. In some circumstances private property dedicated to public uses could become a limited public forum, through some combination of legally binding use restrictions and an established tradition of use for speech purposes. A land swap, zoning approval, or building permits, for example, might be made conditional on a private property owner's agreement to permanently set aside part of his property for public access and use, including traditional First Amendment speech activities, either to substitute for or to supplement "traditional" public fora like parks and streets. Such use restrictions, perhaps in combination with a tradition of actual use for such speech purposes, might create a public forum. Similarly, Congress might create a public forum by insisting that privately owned communications media dedicate a portion of their capacity to unrestricted public access for speech purposes. Nonetheless, I would not reach the question of whether Congress created a public forum in this case because I find state action present in the statutory scheme itself.

*Id.*[9] Advance notice and registration requirements "drastically burden free speech" because they "stifle" the spontaneity and immediacy of expressive activities and "chill[ ] ... the exercise of first amendment rights." *Rosen v. Port of Portland*, 641 F.2d 1243, 1249 (9th Cir.1981) (striking down requirement that speakers wishing to exercise First Amendment rights in port facilities must register in writing at least one business day in advance). Our concern in such cases is that, by singling out a disfavored class of speech and requiring that audiences take special, affirmative steps to receive it, the government effectively blocks many potential listeners from hearing it, and impairs many speakers from providing it. These results are "at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment." *Lamont*, 381 U.S. at 307, 85 S.Ct. at 1496–97 (citation omitted).

In the first place, such disparate treatment clearly implies governmental disapproval of the speech in question, and it is beyond cavil that some stigma attaches to a written request to receive it. *Cf. Lamont*, 381 U.S. at 307, 85 S.Ct. at 1496–97 (placing affirmative duty on recipient of content-defined speech "is almost certain to have a deterrent effect" because the recipient "is likely to feel some inhibition in sending for literature which government officials have condemned....."); *Rosen*, 641 F.2d at 1251 ("Identification requirements impose heavy burdens on the exercise of first amendment rights" because stigma and fear of reprisals will deter many from engaging in disfavored speech activities.).

More importantly, as the majority itself implicitly recognizes, only those who identify themselves as having a compelling interest in receiving the segregated category of speech are likely to take the special affirmative steps necessary to receive it. *See* Maj. op. at 126–127. Others with a milder level of interest or a lesser commitment to challenging the government's disapproval may lack the boldness to step forward and request it, or the initiative to take the affirmative steps necessary to gain access to the sealed-off information. Some may never even become aware that the speech may be received upon special request. Almost certainly fewer people will ultimately hear such speech. And under the new economic realities of a diminished market for their product as a result of governmental intervention, potential producers of such controversial speech will be disinclined to create it. Thus can government-imposed access barriers effectively squelch constitutionally-protected speech.

Yet the majority insists that so long as those who want access to a content-based class of speech *ultimately* may receive it, the government may, without constitutional consequence, freely place obstacles in the way of their receiving it. As a general proposition, this is surely inconsistent with our constitutional traditions of free speech and the unimpeded flow of ideas. We would not so easily tolerate such direct governmental interference with other categories of speech. *Cf. Lamont*, 381 U.S. at 307, 85 S.Ct. at 1496–97; *Rosen*, 641 F.2d at 1252. One suspects that, *sub silentio*, the majority is leaning on a judgment that "indecent" speech is entitled to such a lesser degree of protection than

---

**9.** Attempting to distinguish *Lamont*, the majority misstates the "narrow ground" upon which the Supreme Court relied. *See* Maj. op. at 127 n. 23. The passage more fully reads:

> We rest on the narrow ground that the addressee in order to receive his mail must request in writing that it be delivered. This amounts in our judgment to an unconstitutional abridgement of the addressee's First Amendment rights. The addressee carries an affirmative obligation which we do not think the Government may impose on him.

*Lamont*, 381 U.S. at 307, 85 S.Ct. at 1496. The Court then discussed the requirement's "deterrent effect," noting that some vulnerable government employees would fear for their livelihoods

if they requested forbidden literature. But "[a]part from them, *any* addressee is likely to feel some inhibition in sending for literature which federal officials have condemned as 'communist political propaganda.'" *Id.* (emphasis added). *Lamont*, then, says such requirements burden speech in two ways: first by placing an "affirmative obligation" on the recipient, and second by branding the speech with government disapproval. *See also id.* at 309, 85 S.Ct. at 1497–98 (Brennan, J., concurring) (rejecting government's argument that the requirement is "only inconvenience and not an abridgement," because "inhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government").

other constitutionally-protected categories of speech that the same rigorous standards of constitutional testing do not apply.

Finally, the majority's arguments are fundamentally inconsistent with the realities of television viewing. The market for "indecent" speech does not break down neatly, as the majority suggests, into self-identified groups of those who want indecent speech in their homes, and those who do not. *See* Maj. op. at 127. Many viewers fall somewhere in between. They may not want a steady stream of "indecent" speech, and probably do not want to be perceived (even by their cable operator, much less anyone who might later acquire such information by subpoena or otherwise) as the kind of people who do. They therefore will not affirmatively write for access to the "indecent" channel even if they become aware of it. Yet given a free choice in the matter, they might prefer to have unimpeded, selective access to some but not all programs that fall within that broad umbrella designation. Not only *aficionados* of the arts or of politics but also the mildly curious might well decide to watch an "unvarnished" documentary on the Mapplethorpe exhibit if it is readily available, for example, but may not write to request an entire channel of indecency on the chance that this and similar programs will be included. They may want to shield their children from most "indecent" programming, yet may occasionally find it appropriate to expose older children to frank, even graphic discussions of sexuality and the AIDS epidemic, including some programs that might fall within the FCC's definition of "indecency" (or at any rate are close enough to the line that cable operators will ban them altogether or relegate them to the "indecent" channel). Whether they are "channel surfers" who like to browse before settling on a program, or "appointment viewers" who prefer to study a program guide and watch pre-selected programs, this regulation makes it substantially *more* difficult for cable subscribers to selectively control the content of their viewing on a program-by-program basis. It thus places a substantial burden on their speech rights as adult television viewers, while adding nothing to their ability to exercise *selective* control over their children's viewing. "At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497 (1994). So too, when it comes to umpiring the "decency" of the communications permitted into our homes, the government's role should be restricted to one which supports not replaces society's primary institution for moral education—the family.

III. SECTIONS 10(A) AND (B) DO NOT MEET THE "LEAST RESTRICTIVE MEANS" TEST

A. *What Does the Test Require?*

"Content-based regulations [of speech] are presumptively invalid," *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992), and are "subject ... to the most exacting scrutiny," *Texas v. Johnson,* 491 U.S. 397, 412, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989) (quotation and citation omitted). The Supreme Court has reiterated many times that a content-based regulation of speech must be "the least restrictive means" to achieve a compelling governmental interest. *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836–2837. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Id.* To survive strict scrutiny, then, a content-based regulation must be "precisely drawn" to serve a compelling state interest. *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 540, 100 S.Ct. 2326, 2334–35, 65 L.Ed.2d 319 (1980).

Supreme Court precedent certainly rejects the notion that a content-based regulation of speech will survive regardless of the burden on speech simply because it is the most effective means to achieve a compelling state interest. Quite the opposite. In *Sable,* for example, the government argued that a *total* ban on telephone transmission of indecent speech was the *most* effective, indeed the *only* fully effective way to achieve the government's compelling objective of protecting children. 492 U.S. at 128, 109 S.Ct. at 2837–38. Yet the Supreme Court decisively reject-

ed that argument, conceding that means other than a total ban might be *less* effective.[10] The Court said that a flat ban on indecent speech was not "the least restrictive means to further the articulated interest," *id.* at 126, 109 S.Ct. at 2836, because its "denial of adult access to telephone messages which are indecent but not obscene far exceeds that which is necessary to limit the access of minors to such messages," *id.* at 131, 109 S.Ct. at 2839, and thus the challenged regulation was not sufficiently "carefully tailored." *Id.* at 126, 109 S.Ct. at 2837. As *Sable* demonstrates, a regulation can be the *most* effective means of achieving a compelling interest and still run afoul of the First Amendment if it burdens substantial amounts of protected speech beyond what would be reasonably effective in serving the compelling interest. Here, too, as in *Sable,* the precision demanded of a content-based regulation is decidedly missing.

### B. *What Are the Compelling Interests?*

#### 1. *Protecting Children*

The government asserts a compelling interest in "shielding minors from the harmful effects of indecent programming" entering their homes on cable television. Government Brief at 37. *See also Sable,* 492 U.S. at 126, 109 S.Ct. at 2836–37 (government has a compelling interest in "protecting the physical and psychological well-being of minors" which "extends to shielding minors from the influence of literature that is not obscene by adult standards"); *FCC v. Pacifica Foundation,* 438 U.S. 726, 749, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978). The exact nature of that interest, however, is left unclear in both the government's brief and the majority's opinion. The majority argues somewhat inconsistently that the statute and regulations are aimed at assisting parents in protecting children from indecent speech; and that because parents are not doing an adequate job of supervising their offsprings' viewing, the government must do it for them by keeping indecent programs out of reach. *See* Maj. op. at 127 (citing both rationales but treating them as one). While not inescapably irreconcilable, these goals are often in tension.

If the justification for the ban-or-block scheme is that it will assist parents in monitoring their children's viewing, § 10 is certainly not precisely crafted to do that job. Rather than enhance parental control, it merely deprives all adults as well as children of *any* choice if their cable operator exercises regulatory option (a) and bans indecent programming. Alternatively, if the cable operator does not ban indecent programming altogether, adult viewers are left with a single blanket choice under § 10(b), whether to affirmatively invite the complete repertoire of the "indecent" channel into their home (and perhaps to pay for it). They may either keep *all* indecent leased access speech out of their homes, or let *all* indecent programming in, thereby providing their children with unimpeded access to such programming.[11] Of what help to parents is that?

In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court struck down a statute prohibiting advertisers from mailing unsolicited advertisements for contraceptives to home addresses, on grounds that the ban was not precisely drawn to achieve the government's interest. Although the government argued the statute was designed to "aid[ ] parents' efforts to discuss birth control with their children," the Court said the statute "provides only the most limited incremental support for the interest asserted."

---

10. The Court said that while technological means of protecting children from indecent telephone messages might not be "fail-safe" or "foolproof," 492 U.S. at 130 & n. 10, 109 S.Ct. at 2839 n. 10, nonetheless there was nothing in the record to establish that they would not be "extremely effective." *Id.* at 130, 109 S.Ct. at 2839. Thus while the Court required that such alternative, less restrictive means be "effective," it did not require that they be shown to be equally as effective as a total ban.

11. Parents who elect to receive indecent programming can still use "lockboxes" to lock out selected channels, of course. But in that case, it is the lockbox and not the § 10(b) blocking scheme that is doing all the useful work in shielding children from indecent programming. *See infra* Part III.C.

*Id.* at 73, 103 S.Ct. at 2883–84. While broadly burdening *all* adults by making it more difficult for them to gain access to a constitutionally-protected category of speech, the statute aided only one narrow class of parents, those "who desire to keep their children from confronting such mailings, [but] who are otherwise unable to do so." *Id.* The *Bolger* case is remarkably similar to ours. The statute and regulations here broadly burden all adults, while assisting only the much narrower class of parents who desire to shield their children from all indecent programming but for whatever reason—absence, fatigue, or unwillingness to work it out—feel unable to do so.

As to the government's second prong, a purist interest in protecting children, regardless of their parents' desires—a justification about which we have grave doubts—the government has notably failed to build any record that parental control of children's television viewing is not reliable by itself and must be supplemented or even overridden by a government censor. Congress and the FCC have in the past relied principally as a justification for regulating indecent cable programming on the need to aid parental supervision and guidance. *See* H.R.Rep. No. 934, 98th Cong., 2d Sess. 70 (1984), U.S.Code Cong. & Admin.News 1984, 4655. Governmental restrictions directly interfering with parents' rights to control the information their children receive are regarded with suspicion "regardless of the strength of the governmental interest." *See Bolger,* 463 U.S. at 75, 103 S.Ct. at 2885. In particular, as demonstrated *infra* in Part III.C., there is no record in the agency here demonstrating that measures currently available such as lockbox

technology have been markedly ineffective in shielding children from access to indecent leased access programming. On the other hand, the government has not established that the ban-or-block requirement is sufficiently precise not to overshoot its objective. Adults who desire access to any indecent speech on leased access channels will be entirely deprived or required to specifically request in writing access to an entire channel of it 30 days in advance. If parents choose to request such programming, their children, of course, will also be exposed to it. In fact, the regulation does next to nothing to decouple children's access to indecent programming from adults' access, or to protect children whose parents purposefully bring indecent programming into the home.

To the extent §§ 10(a) and (b) "protect" children at all, they do so by relying on cable operators to ban indecent speech entirely; or on parental inaction in not subscribing to the segregated channel. The degree to which children are protected is directly tied to the degree to which adult access is curtailed, contrary to the well-established principle enunciated in *Butler v. Michigan* that statutes designed to protect children may not "reduce the adult population ... to ... only what is fit for children," 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957), and in *Bolger,* that "[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." 463 U.S. at 74, 103 S.Ct. at 2884.

In this crucial respect, the provisions at issue here differ from the FCC's regulations on indecent telephone communications,[12]

**12.** Senator Helms argued on the Senate floor that the § 10(b) segregation-and-blocking requirement "is precisely the same method that Congress used to block dial-a-porn lines," a method which the courts had "validated." 138 Cong.Rec. S646 (daily ed., Jan. 30, 1992). The Commission similarly argued that "[t]he blocking scheme upheld in these [telephone] cases is, in all relevant respects, identical to that required by section 10(b)." 8 F.C.C.R. at 1000 ¶ 13. These comparisons, however, are highly inaccurate. As the Ninth Circuit observed in *Information Providers' Coalition v. FCC,* 928 F.2d 866, 872 (9th Cir.1991), the telephone "reverse blocking" scheme, under which telephone companies block all access to providers of indecent speech unless

consumers specifically request it in writing, is just one of several alternative access methods permitted under the telephone regulations, and is required only if the message provider elects to bill through the telephone carrier. If the message provider bills directly, it may rely instead on credit cards, access codes, or consumer-controlled descrambling devices to screen out children's access, while allowing adults virtually unimpeded, instantaneous access. Thus in considering whether telephone blocking is the least restrictive means, the court emphasized, "it is critical that the [blocking] system not be considered *in vacuo*" but instead must be seen as part of a "multi-tiered" regulatory scheme which affords both speakers and adult listeners numerous

which allow adults to retain instantaneous and relatively effortless access to such speech through means such as credit cards, access codes, and consumer-controlled descrambling devices, thereby effectively decoupling children's access from that of adults. *See Information Providers' Coalition v. FCC*, 928 F.2d 866, 872 (9th Cir.1991); *Carlin Communications, Inc. v. FCC*, 837 F.2d 546, 557 (2d Cir.) (analogizing these approaches to requirements that sexually oriented magazines be kept under opaque covers or in separate adults-only sections of bookstores; "[i]n each case adults continue to have access to the materials, with minimal inconvenience, while minors' access is restricted"), *cert. denied*, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988). *See also Enforcement of Prohibitions on the Use of Common Carriers for the Transmission of Obscene Materials*, 2 F.C.C.R. 2714, 2719 ¶ 32 (1987) (Commission's objective in designing telephone indecency regulations was "to select the option effectively restricting access to the communications in question *to adults* which is the least intrusive upon protected forms of expression") (emphasis added). By foreclosing children's access in a reasonably effective manner and only minimally burdening adults' access, the telephone regulations achieve the precision of regulation required by First Amendment jurisprudence. No such precision was attempted in these cable regulations.

## 2. *"Uninvited Intruder"*

The majority posits an additional governmental interest: protecting citizens from the

alternative, less burdensome avenues of communication. *Id.*

**13.** The government argues in a footnote to its brief that this is a "legitimate" governmental interest, but nowhere does it suggest that it rises to the level of a "compelling" interest. *See* Government Brief at 37, n. 16. Since only a *compelling* governmental interest can sustain a content-based restriction of speech, the government must be deemed to have waived the argument that this justification is sufficient to support the challenged statute and regulation, although the argument had been advanced at the agency level, *see* 8 F.C.C.R. 999–1000, and on the Senate floor, *see* 138 Cong.Rec. S648 (daily ed., Jan. 30, 1992) (remarks of Sen. Thurmond). I address the question here, however, in response to the majority's reliance on this rationale.

uninvited "intruder" of indecent programming.[13] Maj. op. at 124–125. In the *Pacifica* case, the Supreme Court noted that indecent broadcasts "confront[ ] the citizen . . . in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *Pacifica*, 438 U.S. at 748, 98 S.Ct. at 3040. But whether this rationale could pass the compelling interest test in the broadcast arena, it cannot qualify in the cable context. The FCC itself takes the position that although cable television too enters the home, it comes as an *invited* guest. *First Report and Order*, 8 F.C.C.R. at 1001 ¶ 17 ("Cable television . . . may well be viewed as an invitee into an individual's home"). *See also Cruz v. Ferre*, 755 F.2d 1415, 1420 (11th Cir.1985); *Community Television of Utah, Inc. v. Roy City*, 555 F.Supp. 1164, 1167–69 (D.Utah 1982). Subscribers not only consent to, but must affirmatively request cable service. Like magazine subscribers, cable subscribers pay for the service and are free to cancel their subscription at any time if they do not like the programming they receive. Cable television service is indeed popular,[14] but its widespread dissemination does not transform it from an invitee to an intruder. *Compare Pacifica*, 438 U.S. at 748–50, 98 S.Ct. at 3040–41 (emphasizing narrowness of holding based on "uniquely pervasive" nature of broadcasts over public airwaves), *with Bolger*, 463 U.S. at 74, 103 S.Ct. at 2884 (declining to extend *Pacifica* rationale to mailed advertisements even though mail service is universal).

**14.** The majority correctly points out that more than 60% of all households with televisions subscribe to cable. The majority then adds that "[m]ost cable subscribers do not or cannot use antennas to receive broadcast services," perhaps inadvertently leaving the mistaken impression that without cable, most current subscribers would be left with no television at all. In fact, the quoted passage merely indicates that *while* subscribing to cable, most households do not *simultaneously* receive over-the-air broadcasts. *See* H.R.Conf.Rep. No. 862, 102d Cong., 2d Sess. 57 (1992). Although some consumers are in areas without broadcast service, many (probably most) of these households could and would receive television broadcasts if they terminated cable service.

The government could conceivably have an interest in helping consumers "tailor their invitation" to cover only the cable programming they want. But at least with regard to *adults*, that interest surely cannot be a compelling one. In *Bolger*, the Supreme Court said that the state's interest in "shield[ing] recipients of mail from materials that they are likely to find offensive" "carries little weight" because "[a]t least where obscenity is not involved ... the fact that protected speech may be offensive to some does not justify its suppression." *Bolger*, 463 U.S. at 71, 103 S.Ct. at 2883 (citation and quotation omitted). The First Amendment "does not permit the government to prohibit speech as intrusive unless the 'captive' audience *cannot avoid* objectionable speech." *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 541–42, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980) (emphasis added). As the FCC has repeatedly acknowledged, those adults who object to indecent speech on leased access channels may easily avoid such speech either by cancelling their cable subscriptions and relying on broadcast television as an alternative, or by blocking indecent programs or offensive channels through voluntary lockboxes. *See Broadcast Indecency*, 67 Rad.Reg.2d 1714, 1726 ¶ 62 (1990) (need to regulate indecency is far greater for broadcast than for cable because lockboxes give households control over cable programming entering the home); *Notice of Inquiry*, 4 F.C.C.R. 8358, 8364 ¶¶ 50–51 (1989) (suggesting regulation of broadcast indecency is justified in part by availability of cable as an "alternative" means of adult access to indecent programming where *Pacifica*-type concerns are not implicated due to availability of lockboxes to control access). The "intrusive-

ness" rationale cannot sustain the challenged provisions.[15]

### C. Do Sections 10(a) and (b) Meet the Least Restrictive Means Test?

The government has the burden of showing that the means adopted to achieve the compelling governmental interest are the "least restrictive." *See Sable*, 492 U.S. at 126, 109 S.Ct. at 2836–37; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 74, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Carlin Communications*, 837 F.2d at 555 ("The Government bears the heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression.") (citation and quotation omitted).

As petitioners point out, however, nothing in the record establishes that cable lockboxes—which cable operators are required to provide [16]—are not an effective means of protecting children from "indecent" programming. Indeed, the record strongly suggests otherwise, and even the majority apparently concedes the effectiveness of lockboxes, Maj. op. at 127 n. 22. Congress has found lockboxes to be "effective." *See* H.R.REP. No. 934, 98th Cong., 2d Sess. 70 (1984), U.S.Code Cong. & Admin.News 1984, 4707 (describing lockboxes as a "means to effectively restrict the availability of such [indecent] programming, particularly with respect to child viewers, without restricting the First Amendment rights of the cable operator, the cable programmer, or other cable viewers"). The Commission on several occasions has attested to their efficacy. *See, e.g.*, FCC 85–179, 1985 FCC Lexis 3475, ¶ 132, at *112–13 ("Indeed, we believe that the provision for lockboxes largely disposes of issues involving the Com-

---

**15.** In *Pacifica*, the Supreme Court rejected the argument that an individual offended by indecent broadcasts might simply turn off her set, which the Court analogized to "saying that the remedy for an assault is to run away after the first blow." 438 U.S. at 748–49, 98 S.Ct. at 3040. In the cable context, however, the options of not subscribing or locking out offensive channels are *in addition to* the option of turning off the set. No similar options are available for broadcast media.

**16.** The 1984 Cable Act requires each cable operator to "provide (by sale or lease) a device by

which the subscriber can prohibit viewing of a particular cable service during periods selected by that subscriber." 47 U.S.C. § 544(d)(2)(A). These in-home devices, known as "lockboxes" or "parental keys," allow subscribers at their own discretion to block reception of any channels they do not wish to receive, either indefinitely or for shorter periods of time. Lockboxes thus allow parents to restrict their children's access to selected channels "whether or not parents are physically present and actively supervise." FCC 90–264, 5 F.C.C.R. 5297, 5305 (1990).

mission's standards for indecency...."); *id.* at ¶ 139, *115 (deleting a previous FCC rule barring cable operators from transmitting indecent origination programming, because the rule had become "duplicative of and indeed surpassed by" the lockbox requirement and other provisions of the 1984 Act under which "the public will continue to be protected from obscene and indecent programming"); FCC 90–264, 5 F.C.C.R. 5297, 5305 (1990) ("Technical means are available to block children's access to indecent cable programs.... [Lockboxes] can restrict access by children whether or not parents are physically present and actually supervise."). Not only cable programmers, but cable operators submitted comments during this rulemaking stating that lockboxes are effective. *See* J.A. 94 (programmers); J.A. 250, 253 (operators).

Because the 1992 Cable Act indecency provisions were adopted in a series of floor amendments, without benefit of committee hearings or even substantial floor debate, their legislative history is exceedingly scant. But nowhere in that meager history is there a single comment that anyone in Congress thought cable lockboxes ineffective. *See* 138 Cong.Rec. S646 *et seq.* (daily ed., Jan. 30, 1992) (no mention of lockboxes in Senate floor debate); H.R. Conf.Rep. No. 862, 102d Cong., 2d Sess. 80 (1992) (no mention of lockboxes in conference report describing section 10).[17] Nor did the Commission add any significant findings of its own with respect to the effectiveness of cable lockboxes during this rulemaking. *See First Report and Order,* 8 F.C.C.R. at 1000 (stating in conclusory fashion, without specific findings, that "[w]e agree with Congress' conclusion that the voluntary lockbox approach is not likely to be as effective as cable operator-blocked channels").

The government nonetheless leans heavily on the analogy to telephone technology, suggesting that "voluntary blocking" techniques are ineffective as a means of shielding children from indecent speech. The FCC, however, promulgated its telephone indecency regulations based upon extensive and detailed findings that voluntary blocking was not effective *in the context of telephone technology. See Regulations Concerning Indecent Communications by Telephone,* 5 F.C.C.R. 4926 (1990). The Commission did not conclude that voluntary blocking was in principle unworkable across all technologies; nor did it reach any conclusions whatsoever about cable technology. Instead, the findings were based entirely on considerations specific to telephone technology. That technology is fundamentally different from cable.

First, the Commission found that in the telephone context voluntary blocking was ineffective because telephone companies were able to block only *local* dial-a-porn providers, and for technological reasons were incapable of blocking *long-distance* access to dial-a-porn services. *Id.* at ¶ 16 (telephone blocking technology works by recognizing first three digits of seven-digit local phone number, and blocking three-digit sequences assigned to dial-a-porn services); *see also Information Providers' Coalition,* 928 F.2d at 873. Consequently, voluntary telephone blocking does not prevent minors from accessing dial-a-porn services by long distance calls. That concern is inapplicable in the cable television context, because lockboxes can block *any* channel received in the home.

Second, the Commission found that voluntary telephone blocking was ineffective because telephones, including pay phones, are ubiquitous and readily accessible to children outside the home. 5 F.C.C.R. 4926 at ¶ 16. Although cable television is widely available, it is not nearly as accessible to unsupervised children outside the home as is telephone

---

**17.** Senator Helms did erroneously attribute to the Supreme Court the view that "mandatory blocking" in general "is constitutional and far more effective than voluntary blocking," 138 Cong.Rec. S647 (daily ed., Jan. 30, 1992). In fact, the opinion he cited, *Dial Info. Serv. Corp. v. Thornburgh,* 938 F.2d 1535, 1542 (2d Cir.1991), *cert. denied,* 502 U.S. 1072, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992), was authored by a panel of the Second Circuit, and its conclusions reached only the telephone technology involved in the case before it. In any event, Senator Helms's conclusory approbation of that court's decision cannot be taken to represent a considered judgment by Congress concerning the effectiveness of cable lockbox technology. *Cf. Sable,* 492 U.S. at 129–30, 109 S.Ct. at 2838–39 (conclusory statements in floor debate unsupported by legislative findings or indications of considered legislative judgment not entitled to great weight).

service. Pay phones in particular provide individual, unsupervised, private access to indecent communications on street corners and in shopping malls, movie theaters, restaurants, gas stations, parks, and playgrounds.

Third, the Commission found that voluntary blocking was ineffective in the telephone context because many parents were not even aware that dial-a-porn services existed, much less that voluntary blocking technology was available. Id. at ¶¶ 18, 20; *see also Dial Info. Serv.*, 938 F.2d at 1542 (half of residential households in New York were unaware of either dial-a-porn services or blocking technology). The level of parental awareness of indecent programming and lockbox technology is far greater in the cable context. Unlike telephone subscribers with access to literally millions of telephone numbers, cable subscribers typically receive only a few dozen channels, and parents would have to be hermits to be unaware through newspapers and even television itself of the debate over sex and violence on the tube. Parental unawareness of indecent cable programming at the level of telephone porn has not been established anywhere in the agency record. The Commission's convincing showing that telephone blocking technology was ineffective at shielding minors has no parallel in this case.

The majority accepts—too readily, I think—the government's contention that because the operator can establish no central editorial control on leased access channels, indecent speech comes into the home more "intermittently and randomly" on leased than on regular channels, thereby defeating the effectiveness of lockbox technology. *See* Maj. op. at 125. Because indecent programming can appear on leased access channels at any time, the FCC says, parents must either lock out leased access channels altogether (thus depriving adults in the household of *all* leased access speech), or monitor leased access channels continually, locking and unlocking the control boxes, risking "a slip up or a lapse" that exposes their children to indecent programming. Maj. op. at 125. Less drastic alternatives, however, immediately come to mind. *Segregating* indecent leased access programming, either by channel or by time (*i.e.*, a reasonable "safe harbor" period),

would actively facilitate parental control because parents could use *lockbox* technology more effectively, knowing which channels to lock out, and at which times, to protect their children. Neither Congress nor the FCC has considered whether segregation of indecent leased access programming, when combined with existing lockbox technology, might be an effective yet far less restrictive means of achieving the statute's purported goals than the § 10 ban-or-block scheme.

The majority also suggests that the cost of lockboxes may deter some parents from acquiring and using them. Maj. op. at 127. But again, if this is a real impediment (and there is no record support to show it is), less restrictive means than a ban-or-block scheme are at hand. Cost-spreading—raising everyone's costs the small amount it would take to provide free lockboxes to all takers—would make lockboxes readily available. In fact, many cable operators have already converted to "addressable" systems that incorporate lockbox technology into the cable box that every subscriber receives. *See* J.A. 316–17. These addressable systems accomplish both cost-spreading and universal availability of lockbox technology. Neither Congress nor the FCC considered this new advance in technology.

Finally, neither Congress, the FCC, nor the majority has taken account of where the cost burden of the segregate-and-block scheme will fall, and with what implications for free speech. There are only a few prospects: the cable operators, producers of "indecent" speech, leased access programmers generally, subscribers to "indecent" speech, or subscribers generally. The majority concedes that if the cost is borne by cable operators, it could create sufficient incentives for operators to ban (rather than block) indecent programming so as to implicate state action, and therefore to invalidate § 10(a) as an indirect form of state censorship. *See* Maj. op. at 119. But the majority never considers that if the cost of segregation-and-blocking is placed entirely on programmers of "indecent" speech—or on those who wish to receive such speech—the regulation will place a direct and heavy burden on a con-

tent-defined class of constitutionally protected speech. Whether that burden would be so great as to actually deter such speech, we cannot say; nothing in the record warrants a conclusion either way. But if the burden is on the *government* to show that its content-based regulation is the least restrictive means, it must face and explain away those potential problems.

### IV. State Action Is Indeed in Section 10(C) and It Does Not Meet the "Least Restrictive Means" Test

#### A. *Does State Action Inhere in Section 10(c)?*

State action also inheres in the statutory scheme of § 10(c). In the 1984 Cable Act, Congress authorized local franchising authorities to require cable operators to set aside channels for noncommercial public, educational, and governmental use ("PEG access"), 47 U.S.C. § 531(b), and forbade cable operators from exercising any editorial control over programming on those channels, 47 U.S.C. § 531(e).[18] Then, in § 10(c) of the 1992 Cable Act, Congress changed the rules with regard to a content-defined category of speech, authorizing cable operators "to prohibit the use [of PEG channels] for any programming which contains ... sexually explicit conduct," Pub.L. No. 102–385, § 10(c), 106 Stat. at 1486, which the FCC has interpreted to mean "indecent" programming, *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 19,623, 19,626 (1993).

Quite plainly, the revised statutory scheme is on its face a content-based regulation of protected speech. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of their ... [content] are content-based." *Turner Broadcasting System, Inc. v. FCC*, — U.S. ——, ——, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). Under the statute, cable operators and programmers are subject to two fundamentally different statutorily-assigned schemes of substantive and procedural rights, duties, and burdens with respect to PEG programming. Which of those schemes applies depends solely on whether the content of the programming meets the government's definition of "indecent." *Cf. id.* at ——, 114 S.Ct. at 2459 ("Our precedents ... apply the most exacting scrutiny to regulations that suppress, disadvantage, or *impose differential burdens* upon speech because of its content.") (emphasis added); *id.* at ——, 114 S.Ct. at 2460 (must-carry rules are not content-based because they "impose burdens and confer benefits [on cable operators and broadcasters] without reference to the content of speech" and "interfere with with cable operators' editorial discretion" even-handedly, so that "the extent of the interference does not depend on the content of the ... programming"). The result is that under the government's scheme of differential regulation, indecent speech—as defined by the government—alone is subject to banning by cable operators.[19] To borrow language from the original panel opinion, "the government first strips a cable operator of editorial power over access channels, then singles out material it wishes to eliminate, and finally permits the cable operator to pull the trigger on that material only." *Alliance for Community Media v. FCC*, 10 F.3d 812, 821 (D.C.Cir. 1993), *vacated*, 15 F.3d 186 (1994).

What reason could Congress possibly have for assigning operators and programmers different rights, duties, and procedures on

---

**18.** Section 531(e) contains an exception, however: cable operators may under certain circumstances ban programming that is "obscene or ... otherwise unprotected by the Constitution of the United States." 47 U.S.C. § 544(d)(1).

**19.** Although our emphasis is properly on the statutory scheme of § 10(c) itself, which petitioners challenge here, it is also clear that the nature of the cable operator's decision to ban indecent programming under § 10(c) is of an entirely different character from the exercise of professional medical judgment at issue in *Blum v. Yaretsky*.

As the *Blum* Court explained, those medical judgments were made "according to professional standards that are not established by the State," 457 U.S. at 1008, 102 S.Ct. at 2788. In contrast, the statute here *forbids* the cable operator from exercising, with respect to leased access programming, broad editorial discretion "according to professional standards ... not established by the State." Instead it specifically authorizes a single, highly constrained decision—whether or not to ban material classified as "indecent" under a government-imposed definition.

the basis of such a governmentally-defined content distinction? The only answer is that the government disfavors "indecent" speech, and seeks through this differential regulation to limit speech in that disfavored category—a purpose the government does not disavow. This purpose has nothing to do with restoring genuine "editorial control" to cable operators. The majority's attempt to characterize § 10(c) as a return of "editorial control" sunders the provision from the context of its enactment as part of a broader measure seeking to suppress indecent speech, as well as from its statutory moorings as a singular, content-based exception to an otherwise flat prohibition on the exercise of private judgment. Surely if Congress adopted this kind of selective approach to other content-defined categories of speech—for example, authorizing cable operators to ban programs discussing military spending but no other category—the aim of the government's scheme of dual regulation, suppressing the disfavored speech, would be transparent.[20]

We thus have a congressionally-enacted statute that both facially discriminates on the basis of the content of speech, and has a "manifest purpose" to "burden ... speech of a particular content," *Turner Broadcasting,* — U.S. at —, 114 S.Ct. at 2461 (*either* facial content-based discrimination *or* "manifest purpose" to benefit or burden speech on the basis of content is sufficient to make the statute content-based, triggering strict scrutiny). With rare exceptions, " '[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment,' " *Simon & Schuster v. New York Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991) (quoting *Regan v. Time, Inc.,* 468 U.S. 641, 648–

49, 104 S.Ct. 3262, 3266–67, 82 L.Ed.2d 487 (1984)).

When the § 10(c) statutory scheme works as intended, and cable programmers and adult audiences are deprived of opportunities to communicate and receive indecent speech, that deprivation is "caused by the exercise of some right or privilege created by the State," *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753, namely the cable operator's narrow statutory authorization to ban indecent speech (and only indecent speech). And Congress and the FCC, the "part[ies] charged with the deprivation," "may fairly be said to be ... state actor[s]." *Id.* Because the dual requirements of *Lugar* are met, the deprivation is "fairly attributable" to the government, *id.,* and state action is present.

As the *Lugar* Court explained, "[c]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power," and "avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Id.* at 936, 102 S.Ct. at 2753. Here, a determination that state action is present does not intrude into an "area of individual freedom"—no such sphere was left after Congress denied cable operators control over the content of PEG programming in the 1984 Act, and it is patently obvious that through § 10(c) Congress has not foreshortened but rather extended the "reach of federal law" by creating a narrow, governmentally-structured choice whether to ban a single governmentally-defined category of speech. Where federal law reaches, constitutional scrutiny must follow. Nor is it unfair to attribute to the government the intended and wholly foreseeable consequence of its statute, the suppression of indecent speech. Indeed, under these circumstances it would

---

**20.** The "impetus" for the suppression of disfavored speech thus clearly comes in the first instance from the state, and not a private actor. *Cf. Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172–73, 92 S.Ct. 1965, 1971–72, 32 L.Ed.2d 627 (1972) (when "impetus" for discrimination comes from a private party, state must have "significantly involved itself" to establish state action); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 356–57, 95 S.Ct. 449, 456–57, 42 L.Ed.2d 477 (1974) (state's passive acquiesence

in shutoff policy initiated by regulated utility does not implicate state action; the utility's "exercise of the choice allowed it by state law where the initiative comes from it and not from the State, does not make its action ... 'state action'...."). *Moose Lodge* and *Jackson* implicitly suggest that when the "impetus" or "initiative" for the deprivation comes from the state—as here, through enactment of § 10(c)—state action is more likely present.

be grossly unfair and contrary to the principles underlying the state action doctrine to allow the government to evade constitutional responsibility for its own conduct, simply because it has set up a private party as the triggerman in its carefully crafted scheme.

## B. *Does § 10(c) Meet the Least Restrictive Means Test?*

Section 10(c), which authorizes cable operators to ban indecent speech on PEG channels, is fatally flawed because the government has failed to show that the regulation will make any significant contribution toward furthering the government's asserted interest in protecting children from indecent television programming, much less that it is the "least restrictive means" to achieve that purpose. *Cf. Sable*, 492 U.S. at 126, 109 S.Ct. at 2836 (the means chosen must "further the articulated interest"). Where § 10(c) achieves its intended effect, the result will be a total ban on indecent speech, and therefore a total deprivation of programmers' and adult audiences' rights to communicate and receive such speech. We do not know from the agency record, however, whether the regulation will "protect" one percent, twenty percent, fifty percent, or one hundred percent of the nation's children. Indeed, that is left to the standardless discretion of cable operators. What we do know is that § 10(c), like §§ 10(a) and (b), will be of no use in helping *parents* supervise their children's viewing; the decision is taken out of their hands, and placed in the hands of their cable operator.

In addition, just as with the §§ 10(a) and (b) ban-or-block scheme, § 10(c) shields children from indecent programming only by simultaneously depriving programmers and adult viewers of their speech rights, without attempting to decouple children's access from that of adults. Consequently, to the extent § 10(c) has any effect in shielding children from indecent programming, it also impermissibly "reduce[s] the adult population ... to ... only what is fit for children." *Butler v. Michigan*, 352 U.S. at 383, 77 S.Ct. at 526. I would conclude that the government has not shown that the § 10(c) permissive ban

scheme is the "least restrictive means" to achieve a compelling governmental interest.

## V. CONCLUSION

Because Section 10 is state action restricting constitutionally-protected speech, and because the government has not met its constitutionally-imposed burden of showing on this record that these provisions are the least restrictive means necessary to achieve the compelling governmental interest of protecting children in the context of the family unit, I respectfully dissent.

HARRY T. EDWARDS, Chief Judge, dissenting in part:

I agree with the judgment reached by the dissent—that sections 10(a) and 10(b), together, constitute state action and do not provide the least restrictive means to further the Government's asserted interest in promoting the well-being of children. According to the Government, children face harm from exposure to "indecent" programming on leased access cable television, so it is contended that Congress may lawfully act to ban such programming. There is not one iota of evidence in the record, however, to support the claim that exposure to indecency is harmful—indeed, the nature of the alleged "harm" is never explained. This being the case, there is little doubt in my mind that the statute as presently written fails constitutional scrutiny.

I write separately because I do not entirely agree with the analysis underlying Judge Wald's dissent. Frankly, I think that Congress may properly pass a law to facilitate *parental supervision of their children, i.e.*, a law that simply segregates and blocks indecent programming and thereby helps parents control whether and to what extent their children are exposed to such programming. However, a law that effectively *bans* all indecent programming—as does the statute at issue in this case—does not facilitate parental supervision. In my view, my right as a parent has been preempted, not facilitated, if I am told that certain programming will be banned from my cable television. Congress cannot take away my right to decide what my children watch, absent some showing that my

children are in fact at risk of harm from exposure to indecent programming. But Congress surely can, I think, act to help me implement the decisions that I make as a parent. However, this latter interest—facilitating parental supervision—has not been advanced by the Government in this case.

Because the foregoing propositions seem self-evident to me, I will refrain from an elaborate constitutional analysis of section 10's provisions. It is not so much the constitutionality of these provisions that I find perplexing, but rather the shortsightedness of Congress in enacting a scheme that does so little to deal with the ills of television. At bottom, I think this case is much ado about nothing much.

\* \* \* \* \* \*

I agree with the majority that section 10(c) does not constitute state action and, therefore, does not pose any constitutional problems. Section 10(c) merely directs the FCC to allow cable operators to prohibit the use of their PEG-access channels for programming which contains obscenity, sexually explicit conduct, or material soliciting or promoting unlawful conduct. Cable operators' decisions to allow or prohibit such speech are their own; their action or inaction does not trigger any alternative regulatory regimes. In section 10(c), Congress merely returns some editorial control to cable operators, and this is not the least bit objectionable in my view.

Sections 10(a) and 10(b), however, constitute state action. These two provisions, read together, do not merely return some editorial control to cable operators, they tend to mandate a preferred result. Section 10(a) allows cable operators to ban indecent speech, and section 10(b) mandates that those cable operators who do not prohibit indecency must segregate and block the indecent programming. While the language of these two provisions contains a choice—indeed, the majority focuses on this "choice"—the choice is of little moment. Judge Wald's dissent is persuasive on this point.

If the statute did not contain section 10(b), I would agree with the majority that, section 10(a), itself, does not constitute state action, for the same reasons that section 10(c) is unobjectionable. Section 10(a), standing alone, merely directs the FCC to allow cable operators to prohibit indecent programming. But section 10(a) does not stand alone. Section 10(b) hinges on section 10(a): it speaks only to those who "have not voluntarily prohibited under subsection ([a])" and mandates that they segregate and block indecent programming.

In analyzing sections 10(a) and 10(b) separately, the majority effectively ducks the question of incentives. But I cannot comprehend how this issue can be avoided in any decision regarding the legality of the Act. If you are a cable operator interested in making money and you are faced with the virtually cost-free option of banning indecency or the likely costly option of segregating and blocking indecent programming, which option would you choose? The answer seems easy. However, the majority declines to indulge the obvious, contending that "the Commission has yet to consider the matter" of whether the costs associated with segregating and blocking must be borne by the cable operator. The majority also finds that petitioners have not met their burden of proving that the costs of implementing section 10(b) would drive cable operators to ban indecent speech under section 10(a), a conclusion that seems a bit circular given that the Commission has not yet considered the matter. Nevertheless, the majority admits that "[t]he situation might well be different if the Commission were to adopt a policy that created a significant economic disincentive for operators to segregate and block indecent programming." I think that financially minded cable operators will have little doubt which option to choose. Because sections 10(a) and 10(b) are linked—indeed the costs associated with section 10(b) will prompt financially minded cable operators to choose section 10(a)—the majority's attempt to divide and conquer is not ultimately persuasive.

If the statute did not contain section 10(a), I might agree with the majority that section 10(b) passes constitutional muster. The Government claims that the statute is meant to protect children from the harmful effects of indecent programming. Had the Government offered some evidence of the harmful effects of indecent programming on children,

I might find section 10(b), standing alone, constitutional. "When the Government defends a regulation on speech as a means to ... prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broadcasting System, Inc. v. FCC*, —— U.S. ——, ——, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994) (plurality) (quoting *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 (D.C.Cir.1985)). The Government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* (citing *Edenfield v. Fane*, —— U.S. ——, —— – ——, 113 S.Ct. 1792, 1798–99, 123 L.Ed.2d 543 (1993)). The Government has not offered one shred of evidence that indecent programming harms children.

The Government might have suggested that section 10(b)'s segregate-and-block scheme was meant to further a compelling interest in facilitating parental supervision of the cable programs their children watch. Indeed, in a case argued the same day as this one, the Government described its interest in promoting the well-being of children as encompassing both the interest in shielding children from indecency and facilitating parental supervision. *See* Brief for Respondents at 16–17, *ACT v. FCC* (No. 93–1092). This second interest undoubtedly finds ample support in Supreme Court case law. *See, e.g., Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) (stating that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society"); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (striking state law requiring children to attend public schools as "interfer[ing] with the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (striking state law that prohibited teaching in foreign languages to children as interfering with "the power of parents to control the education of their own"). Contrary to Judge Wald's dissent, I do believe that a segregate-and-block scheme would facilitate parental supervision.

In fact, I might find that section 10(b), standing alone, is the least restrictive means of furthering the Government's interest in facilitating parental supervision of children. A segregate-and-block system can help parents monitor the programming their children watch. For those parents who want to keep all indecent programming out of the house, it provides an easy mechanism to do so. For those parents who wish to expose their children to the myriad of leased-access programming, section 10(b) allows them to subscribe to the segregated channels. For those parents who wish to do their own screening, it undoubtedly helps to know that all of the leased-access "indecent" programming is located on one channel. Those parents can control their children's viewing either by instructing them about what they may not watch or by using a lockbox or some such device which gives television owners control over unwanted programs. As Judge Wald notes, the segregate-and-block methodology embraced by section 10(b) is a rather unsophisticated approach to achieve a goal of parental supervision: surely Congress has reason to know that there are more efficient technological devices available to segregate and block categories of programs and thereby facilitate parental choices of preferred programming. Despite the legislative failure to adopt more efficient alternatives, I would still find section 10(b) unobjectionable if it stood alone and if the Government justified it as a means to facilitate parental supervision. What I might think if the statute were written differently, however, does not help me deal with what is now before the court.

As I see it, sections 10(a) and 10(b) are connected parts of a whole, which work in tandem to produce an absolute *ban* on indecent speech. A ban does nothing to facilitate parents' supervision of their children, unless we assume that all parents' views are not only identical to each other, but also the same as the Government's. This assumption is preposterous, and the Constitution simply

does not permit a flat ban of protected speech.

 * * * * * *

There is one other aspect of the majority opinion that I find troubling. In a somewhat obscure line of analysis, the majority intimates that *cable* should be subject to the same First Amendment protections as *broadcast*. To advance this point, the majority argues that "the constitutionality of indecency regulation in a given medium turns in part, on the medium's characteristics" and that "it is apparent that leased access programming has far more in common with radio broadcast in *Pacifica* than with the telephone communication in *Sable*." This simple equation is superficially appealing, but it does not produce the result suggested by the majority.

For many reasons that need not be addressed here, I surely agree with the majority that it makes no sense to treat broadcast and cable differently. It does not follow from this, however, that the First Amendment protections afforded to cable should be *reduced* to the level normally reserved for broadcast. *See FCC v. Pacifica*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) ("[O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection."). In fact, the Supreme Court recently decided this question and rejected the position seemingly advanced by the majority:

> We address ... the ... contention that regulation of cable television should be analyzed under the same First Amendment standard that applies to regulation of broadcast television.... [T]he rationale for applying a less rigorous standard of First Amendment scrutiny to broadcast regulation, whatever its validity in the cases elaborating it, does not apply in the context of cable regulation.

*Turner Broadcasting*, —— U.S. at ——, 114 S.Ct. at 2456.

Content-based regulations of cable television programming must satisfy exacting First Amendment scrutiny. And a regulation premised on a claim that "indecent" programming causes harm to children must be justified by some evidence of the harm claimed.

## POSTSCRIPT

This court has spent a great deal of its energy analyzing section 10: the court has now heard the case twice; and it has produced opinions of considerable length, analyzing a great deal of constitutional case law. And yet, I cannot help but wonder what Congress is doing. Why has Congress chosen to regulate "indecency" on leased-access and PEG-access channels, as opposed to all cable channels? Congress claims it is concerned with protecting children from the ills of televised indecency. Is there any viewing individual who would suggest that leased-access and PEG-access channels constitute the principal sources of our indecency problems on television? While, as the majority states, "there is no constitutional rule forbidding Congress from addressing only the most severe aspects of this problem," it is ridiculous to believe that leased-access and PEG-access present the most severe aspects of the indecency problem on television in American society.

The majority acknowledges that "there undoubtedly is indecent programming on other cable channels," but notes that "[o]perators have the power to impose a segregation and blocking system on the vast majority of their non-access channels, because their editorial control over such channels is unfettered by federal regulation." While cable operators may have that option, there is nothing to suggest that they are voluntarily segregating and blocking indecent programming in the absence of the Government's regulatory hand. And if Congress really believes that indecent programming is harmful to children, why are commercial cable operators given a free hand to do as they see fit? This makes no sense whatsoever.

The majority quotes the FCC, stating that cable operators generally may provide indecent programming through "per-program or per-channel services that subscribers must specifically request in advance, in the same manner as under the blocking approach mandated by section 10(b)." However, this is no answer at all, because the current arrange-

ments for cable subscriptions do not purport to segregate "indecent" programs on select channels (or otherwise carefully identify them) so that they might be systematically offered in isolation apart from other commercial offerings. Furthermore, many subscribers purchase cable service to get improved television reception, and a number of basic cable subscriptions are packaged to include channels that offer some indecent programming; so these subscribers will get indecent programming whether they want it or not. In short, *if* "indecency" really is a problem on television, then the source of the problem resides on the commercial cable stations, not on leased-access and PEG-access channels. Yet, Congress has done nothing to facilitate parental supervision in connection with commercial cable programs.

Even more curious is Congress's failure to address violence on television. One recent poll revealed that eighty percent of Americans surveyed agreed that violence on TV shows is harmful to society. *See* 139 CONG. REC. S5050–52 (daily ed. Apr. 28, 1993) (summary of Times Mirror poll). And there is significant evidence suggesting a causal connection between viewing violence on television and antisocial violent behavior.[1] Yet, as this case shows, Congress has focused on a mere pittance in addressing indecency on PEG- and leased-access cable, where viewership is paltry. And in focusing on indecency, as opposed to violence, Congress has addressed a "problem" that has yet to be shown to have any harmful effects. This is hard to fathom.

It is not my role as a judge to legislate, I understand. But it is hard to restrain from comment when one is asked to spend so much time on something of so little consequence in terms of its overall effect on society. From my vantage point, Congress

seems to have sent the FCC on a fool's errand. Even if section 10 were constitutional—as the majority holds that it is—one still would be tempted to ask, "so what?". I cannot dismiss the importance of the First Amendment rights at stake, however, so I dissent. In my view, sections 10(a) and 10(b) of the Act as presently written offend the Constitution.

ROGERS, Circuit Judge, concurring in part and dissenting in part:

Because the court is in agreement that § 10(b) constitutes state action,[1] the most important question in this case is whether the segregation and blocking method established by § 10(b) is the least restrictive means to accomplish the compelling state interests asserted. Essentially for the reasons noted by the Supreme Court in *Sable Communications, Inc. v. FCC,* 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the government has failed to support § 10(b) with the requisite showing that the segregation and blocking method represents the least restrictive alternative. It is neither carefully tailored nor supported by evidence that less restrictive alternatives are not readily available. Parts II and III of Judge Wald's dissenting opinion ably describe these deficiencies, and I join her conclusion that § 10(b) is unconstitutional whether it stands alone or in conjunction with the other provisions of § 10.

The court, however, has an obligation to save rather than destroy as much of the statute as is constitutional, *see Tilton v. Richardson,* 403 U.S. 672, 684, 91 S.Ct. 2091, 2098–99, 29 L.Ed.2d 790 (1971) (citations omitted), and, in my view, § 10(b) is severable. Consequently I cannot join Judge Wald's analysis of the severability of § 10(b) from the remainder of § 10 or the constitu-

---

1. *See, e.g.,* ALBERT BANDURA, AGGRESSION: A SOCIAL LEARNING ANALYSIS 72–76 (1973); WILLIAM A. BELSON, TELEVISION VIOLENCE AND THE ADOLESCENT BOY (1978); GEORGE COMSTOCK, THE EVOLUTION OF AMERICAN TELEVISION 159–238 (1989); MONROE M. LEFKOWITZ ET AL., GROWING UP TO BE VIOLENT: A LONGITUDINAL STUDY OF THE DEVELOPMENT OF AGGRESSION (1977); L. Rowell Huesmann, et al., *The Effects of Television Violence on Aggression: A Reply to a Skeptic,* in PSYCHOLOGY AND SOCIAL POLICY 191 (Peter Sued-

feld & Philip E. Tetlock, eds., 1992); David Pearl, *Familial, Peer, and Television Influences on Aggressive and Violent Behavior, in* CHILDHOOD AGGRESSION AND VIOLENCE: SOURCES OF INFLUENCE, PREVENTION, AND CONTROL 231, 236–37 (David H. Crowell et al., eds., 1987).

1. *See* majority opinion at Part III; dissenting opinion of Judge Wald at Part I; dissenting opinion of Chief Judge Edwards at 146.

tionality of the provisions remaining after severance. *See* dissenting opinion of Judge Wald at 134 n. 7, 143–144; *see also* dissenting opinion of Chief Judge Edwards at 147.

The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

*Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (internal quotation marks and citation omitted); *Buckley v. Valeo,* 424 U.S. 1, 108–09, 96 S.Ct. 612, 677–78, 46 L.Ed.2d 659 (1976); *Champlin Refining Co. v. Corporate Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 564–65, 76 L.Ed. 1062 (1932). "[T]he presumption is in favor of severability." *Regan v. Time, Inc.,* 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion); *see also Alaska Airlines,* 480 U.S. at 685, 107 S.Ct. at 1480 ("the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted").

This presumption is not rebutted with respect to the three remaining subsections—(a), (c), and (d). It is true, as Judge Wald notes, that one purpose of § 10 was to "for-bid cable companies from inflicting their unsuspecting subscribers with sexually explicit programs on leased access channels." 138 Cong.Rec. S646 (daily ed. Jan. 30, 1992) (Senator Helms). *See* dissenting opinion of Judge Wald at 134 n. 7. Senator Helms' statement quoted by Judge Wald, however, is not the only statement of Congressional intent with respect to § 10. Congress also intended to free cable operators from the burden of being required to carry indecent materials on both leased access and PEG channels. The clear purpose of § 10(c) is to empower cable operators to exercise editorial judgment over their PEG channels to prohibit sexually explicit conduct and materials soliciting or promoting unlawful conduct.[2] Similarly, one of the purposes of §§ 10(a) & (b) was to restore editorial control over leased access programming to the cable operators, a goal deemed of importance to several Senators who spoke in support of the amendments.[3] *See also* majority opinion at 134 ("The immediate aim . . . is to give cable operators the prerogative not to carry indecent programming on their access channels."). Implicit in these comments and the adoption of § 10(c) alone with respect to PEG channels, is the expectation that the restoration of such control would serve the Congressional goal of reducing the amount of indecent programming that appears on cable television and is therefore potentially accessible to children. Thus, it is clear that

---

**2.** Senator Fowler offered § 10(c) in order to remove the restriction on the authority of cable operators to prohibit indecent programming on PEG channels. 138 Cong.Rec. S649 (daily ed. Jan. 30, 1992). He referred to the use of PEG channels to "basically solicit prostitution through easily discernible shams." *Id.* Senator Wirth, also decrying the abuse of PEG channels, spoke in support of § 10(c) as "giv[ing] a very clear signal to the cable companies that, in fact, they can police their own systems, which they cannot do now. This is a service not only to the public, but, also, to the cable companies themselves." *Id.* at S650.

**3.** In introducing what became §§ 10(a) & (b), Senator Helms explained that "[t]he problem is that cable companies are required by law to carry, on leased access channels, any and every program that comes along...." 138 Cong.Rec. S646 (daily ed. Jan. 30, 1992) (regarding § 27 of the Senate bill). He explained that his amendment had two parts:

Under my amendment, cable operators will have the right to reject such filthy programming, and if they do not reject it, consumers have the right to reject such programming from being fed into their homes.

. . . .

. . . First, the pending amendment will allow a cable company to decline to carry on leased access channels programs that "describe or depict sexual or excretory activities or organs in a patently offensive manner."

. . . .

The second part of the pending amendment . . . requires the FCC to set rules [to segregate and block] unless a subscriber requests in writing such channel to be unblocked.

*Id.* In support of Senator Helms' amendment, Senator Thurmond also expressed a desire to relieve cable operators of the obligation of carrying indecent programming. "The problem is that cable companies are required by current law to carry on these leased channels any program that may come along." *Id.* at S648.

§§ 10(a) & (c) do fulfill at least one of the purposes of § 10, even when § 10(b) is severed. *See* 2 NORMAN J. SINGER, SUTHERLAND ON STATUTES & STATUTORY CONSTRUCTION § 44.07, at 518 (5th ed. 1993) (If a statute "attempts to accomplish two or more objects and is void as to one, it may still be valid as to the others.") (citation omitted).

Once § 10(b) is severed, § 10(a) no less than § 10(c) would be constitutional. *See generally* majority opinion Part II;[4] *see also* dissenting opinion of Chief Judge Edwards at 146. Although the question is not without difficulty, that §§ 10(a) & (c) restore to cable operators editorial control over a narrow and content-based class of speech, *see* dissenting opinion of Judge Wald at 30, does not render them unconstitutional. *See* majority opinion at 114–115. Without the alternative regulatory scheme, imposing the combined technical, administrative, and financial burdens on cable operators as exists under § 10(b), the cable operator is left with the option, on the one hand, to allow, encourage, or facilitate indecent speech, or, on the other hand, to ban or otherwise impede indecent speech; there is no state imposed burden on the choice.

Accordingly, I concur in the judgment of the court upholding §§ 10(a), 10(c) and 10(d), but I dissent from the holding in Part III that the government has met its burden to show that § 10(b) is the least restrictive alternative; in that regard I join Parts II and III of Judge Wald's dissenting opinion.

---

4. I agree with the reasoning in Part II B only to the extent that the court concludes that petitioners have failed to show here, on this record, that the leased access and PEG channels are "public forums." *See* dissenting opinion of Judge Wald at 134 n. 8.

